IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| JEAN A. MONTGOMERY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No. 1:15-cv-10840 |
| vs. | ) | |
| | ) | |
| CHARLES SCIALLA, | ) | Honorable Robert M. Dow, Jr., |
| WILLIAM SIMPSON, | ) | Judge Presiding |
| SCIALLA ASSOCIATES, INC., and | ) | |
| NATIONAL ASSOCIATION OF | ) | Honorable Sheila Finnegan, |
| POSTAL SUPERVISORS, | ) | Magistrate Judge |
| | ) | |
| Defendants. | ) | JURY DEMANDED |

## FIFTH AMENDED COMPLAINT

NOW COMES the Plaintiff, JEAN A. MONTGOMERY, by and through her

attorneys, John P. DeRose and Caitlyn F. DeRose of John P. DeRose & Associates,

and as and for her Fifth Amended Complaint against Defendants, CHARLES

SCIALLA, WILLIAM SIMPSON, SCIALLA ASSOCIATES, INC., and NATIONAL

ASSOCIATION OF POSTAL SUPERVISORS (NAPS) states as follows:

### JURISDICTION

1. This action is brought pursuant to 28 U.S.C. § I332(a); and the jurisdiction

of this court is invoked pursuant to 28 U.S.C. § I332(a) because there is complete

diversity between Plaintiff and all Defendants.

2. Venue is appropriate and lies in the Northern District of Illinois, Eastern

Division, pursuant to 28 U.S.C. §§ 1391( b)(1) 1391( b)(2) because the events giving

rise to this claim occurred in this Judicial District and Defendants conduct business

in this judicial district and because a substantial part of the events giving rise to the claim occurred in this judicial district.

## PARTIES

3. At all times herein mentioned, Plaintiff Jean Montgomery (hereinafter "Ms. Montgomery" or "Plaintiff"), was and is a citizen of the State of Illinois, and was employed by United States Postal Service in the State of Illinois for almost 45 years, and was last employed as the Manager of Customer Service at the Englewood Post Office when she was terminated.

4. At all times herein mentioned, Defendant Charles Scialla (hereinafter sometimes referred to as "Scialla" or "Defendant Scialla"), was and is a citizen of the State of New Jersey, and is the president of Defendant Scialla Associates, Inc.

5. At all times herein mentioned, Defendant William Simpson (hereinafter sometimes referred to as "Simpson" or "Defendant Simpson"), was and is a citizen of the State of Pennsylvania, and is an employee of Defendant Scialla Associates, Inc.

6. At all times herein mentioned, Defendant Scialla Associates, Inc. (hereinafter sometimes referred to simply as "Scialla Associates, Inc.") was and is an active corporation duly organized on January 4, 1985, registered with the New Jersey Secretary of State, and currently existing under the laws of the State of New Jersey, having its headquarters and its principal place of business in Fairfield, New Jersey.

7. At all times herein mentioned, Defendant National Association of Postal Supervisors (hereinafter sometimes referred to simply as "NAPS") was and still is

an active corporation duly organized, registered with the Virginia Secretary of State, and existing under the laws of the State of Virginia, having its headquarters and its principal place of business in Alexandria, Virginia.

## FACTUAL ALLEGATIONS

## I. REPRESENTATIONS BY DEFENDANTS

8. NAPS has membership of approximately 26,000 active and retired United States Postal Service (USPS) supervisors and managers.

9. NAPS is a management association, not a union and is unique among federal management associations in that its rights are statutory, with a high level of detail concerning its relationship with USPS.

10. NAPS was established under Title 39, US Code, Section 1004.

11. NAPS proclaims to its membership and to the public:

> The object of this association shall be to promote, through appropriate and effective action, the welfare of its members, and to cooperate with the USPS and other agencies of the federal government in a continuing effort to improve service, to raise the standard of efficiency and to widen the field of opportunity for its members who make the Postal Service or the federal government their life work.

12. In 1993, NAPS purchased a new four-story building in Alexandria, VA for $3.125 million, in compliance with a 1990 National Convention resolution.

13. Because Virginia state law requires nonprofit organizations owning property to incorporate, the NAPS Board established NAPS Property, Inc.

14. In 1998, NAPS reaffirmed its right to continue to represent members who accept new EAS positions in the area offices or at USPS Headquarters.

15. In 2001, NAPS' attorneys concluded that employee rights in the event of a USPS Inspector General interview are "limited to constitutional and statutory rights to have representation and to avoid self-incrimination."

16. In 2008, Ms. Montgomery attended the NAPS 61st National Convention in Louisville, Kentucky where President Ted Keating yielded the floor and introduced Charles Scialla as an attorney who would answer questions for the NAPS membership.

17. In the presence of Ms. Montgomery, Defendant Charles Scialla held himself out as an attorney representing NAPS and its members.

18. In 2012, a nationwide survey conducted by NAPS revealed considerable anxiety among members over their job futures, as well as high interest in pursuing retirement over the next several years.

19. In August 2012, Delegates to the NAPS 63rd National Convention in Reno, Nevada heard addresses from several persons, including Defendant Charles Scialla, President of Scialla Associates, Inc., who said in pertinent part:

> …
>
> Let me ask one question: How many people were at the last convention when I spoke?
>
> Ok -- okay. You're the ones I'm angry at.
>
> You promised me you were going to put me out of business. You've given me more business since the last convention than I had the convention before, so we must be doing something wrong, and don't know what it is.
>
> But we try our best in Scialla Associates to represent the members to the best of our ability, have some very good

4

associates. Normally, I don't tell you where we are, but I'm going to give you my record of 26 years. We've done forty-four hundred -- 4,494 cases since its inception. We are one of the few groups that do MSPB. …

I can stand here and tell you we have never lost a case on failure to perform, but I can't stand here and tell you that we never lost a case on falsification. You can't falsify TACS. You can't falsify scans. You can't falsify dispatches. If you forgot something, you made a mistake, admit the mistake.

If you tell the truth, you give me a 95% chance to win the case. If you tell a lie or you try to get around something, hopefully we go in 50/50. Now, that's a big difference between 90, 95 and 50/50.
…

Normally, it's the agency about 90%. We've won 337 cases. We lost 277 cases. We settled 1704 case.

Settlements mean that the appellant, or my client, is satisfied with the settlement. We never settle unless the clients agreeable to settle. We've had 494 cases dismissed, 335 cases were withdrawn.
…

Again, just remember, a new member gets a letter of -- of -- actually, a person who gets a notice of proposed adverse action and is not a member, even when they join, they do not get the benefits of DDF, and I do get cases that come in that I have to call down to NAPS headquarters and say, "Is so-and-so a member?" And they say, "No. We --we can't find them on the list."

You must be there at least 90 days prior to receiving the disciplinary action. If not, you're not going to get represented by NAPS.

I have attorneys who will represent people. We tried to be ver-- very realistic on the-- on the cost, but we don't do it for what we charge NAPS….

20. On the Internet, under Frequently Asked Questions (FAQ), NAPS proclaims in pertinent part:

> What are the benefits of NAPS membership?
>
> If you need a reason for joining NAPS, here are three: representation, information, and opportunity. Over 26,000 NAPS members have representation where it counts–at Postal Service Headquarters and on Capitol Hill. Whether the issue is pay, benefits or working conditions, you have a qualified group of professional advocates working on your behalf, especially in times of real need. For approved cases, NAPS' Disciplinary Defense Fund provides a trained advocate for members facing removal, reduction in grade and postal financial indebtedness (Debt Collection Act).

21. On the Internet, Scialla Associates, Inc. is prominently advertised and described as "a Law Practice company" as follows:

> Scialla Associates, Inc.
> 387 Passaic Ave Ste 1, Fairfield, NJ 07004 >
> Business Background Report
>
> Company Profile
> Industry: Law Practice, Management Consulting Services
> Phone:(973) 808-8258
> Description: Scialla Associates Inc. is a Law Practice company located in 387 Passaic Ave Suite 1,
> Fairfield, New Jersey, United States.
> Members (2): Marie Scialla (Treasurer, Secretary)
>           Charles Scialla (President)

(The Internet advertisement for Scialla Associates Inc. is attached hereto and made a part hereof as Plaintiff's Exhibit "A").

## II. PLAINTIFF'S REASONABLE RELIANCE ON REPRESENTATIONS

22. Ms. Montgomery and other members and officers of NAPS Illini Area had a right to rely upon the representations by Charles Scialla, Scialla Associates, Inc.

and NAPS that they were providing her an attorney licensed to practice law to represent her before the United States of America Merit Systems Protection Board.

23. Because of the representations made by NAPS, by Charles Scialla, by William Simpson, and by Charles Scialla, Inc., both Ms. Montgomery and Illini Area Vice President Nancy Wesley were always under the impression that any person sent by Charles Scialla, Inc. to represent a member before the US Merit Systems Protection Board was an attorney licensed to practice law.

24. Jean Montgomery had a right to and did rely on the representations that Charles Scialla was the NAPS Attorney and licensed to practice law.

25. Just as Charles Scialla proclaimed at the NAPS 63rd National Convention on August 24, 2012 in Reno, Nevada, the "Law Practice of Scialla Associates Inc." and Charles Scialla, Esquire[1], and William Simpson, Esq. have been filing and continue to file their appearances for members of NAPS in litigated matters before various tribunals of the United States of America Merit Systems Protection Board across the country for years. (See the documents filed before various tribunals of the United States of America Merit Systems Protection Board, attached hereto and made a part hereof as Plaintiff's Exhibit Group "B").

26. As a NAPS member since 1982, Ms. Montgomery was aware and relied on the assurances that "NAPS' Disciplinary Defense Fund provides a trained advocate for members facing removal".

---

[1] "Esq." as found in Wikipedia: In the United States, Esquire is mostly used to denote a lawyer, in a departure from traditional use, and is irrespective of gender. In letters, a lawyer is customarily addressed by adding the suffix Esquire (abbreviated Esq.), preceded by a comma, after the lawyer's full name.

27. As a member since 1982, Ms. Montgomery has always relied on the assurances from NAPS that if she sought approval, she would be provided legal representation when and if she would be facing removal from the United States Postal Service.

28. In June 2010, Lewis M. Atkins, the Executive Vice President of NAPS ran for President of NAPS and advised that the first change he was looking to make for NAPS members was as follows:

> Hiring a new law firm to represent us in legal matters.
> Our current law firm has lost its long influence that they
> once had in Washington for the purpose that we need.

(The email To Elect Lewis M. Atkins, dated June 7, 2010, p. 4, is attached hereto and made a part hereof as Plaintiff's Exhibit "C").

### III. PLAINTIFF'S NEED FOR LEGAL REPRESENTATION

29. On April 2, 2012, after 44 years and 10 months of loyal service, Ms. Montgomery was served with a Notice of Proposed Removal from the United States Postal Service based on the charges of Failure to Report an Accident and Failure to Perform Assigned Duties.

30. Ms. Montgomery was represented at the removal hearing by NAPS Illini Area Vice President Nancy L. Wesley, but was removed from the United States Postal Service on January 9, 2014.

## IV. THE OFFER OF LEGAL REPRESENTATION
## COMMUNICATED TO ALL PARTIES THROUGH
## NAPS ILLINI AREA VICE PRESIDENT

31. On seeking a second term as NAPS Illini Area Vice President, Nancy L.

Wesley advised NAPS Illini Area members that they were being sent to Defendant

Charles Scialla and assigned attorneys for representation before the Merit Systems

Protection Board at the Metcalf Federal Building in Chicago:

> Grievance activity in Illinois included more OIG
> involvement and more Debt Collection cases. TACS and
> Failure to Perform Duties in an Efficient Manner were
> the dominant charges for disciplinary action. I handled
> seven Debt Collection cases for supervisors in three
> Districts. Three were forwarded to Charles Scialla for
> hearings. Thus far, two of the three have been settled
> with the Notice of Involuntary Offset being withdrawn
> and expunged. Hats off to Charlie! The last one was a real
> battle!!
>
> I handled nine Adverse Action cases where removal had
> been proposed. Four were settled without having to
> appeal to MSPB for a resolution. Removal was sustained
> in one. Two were settled with a reduction in grade, but
> the supervisors remained on the rolls. Two opted to retire
> after hearing the decision. One was settled by awarding
> the supervisor a non-supervisory EAS 17 position. At my
> request, I've shadowed the assigned attorneys to assist in
> settling the cases. Once I participated in a MSPB
> Mediation meeting at the Metcalf Federal Building in
> Chicago.

(See the announcement drafted by Nancy L. Wesley on the occasion of seeking a

second term as NAPS Illini Area VP, wherein she advises that NAPS Illini Area

members that their cases were being sent to Charles Scialla and assigned attorneys

for representation, attached hereto and made a part hereof as Plaintiff's Exhibit

"D").

32. NAPS Illini Area Vice President Nancy L. Wesley long held the belief that Charles Scialla was the NAPS Attorney responsible for filing for a MSPB hearing. (See the email request made on May 7, 2012, wherein Ms. Wesley advises Denise A. Cameron, Manager of Human Resources, U.S. Postal Service Chicago District that she will contact "NAPS Attorney Charles Scialla today about filing for a MSPB hearing" for Jean Montgomery, attached hereto and made a part hereof as Plaintiff's Exhibit "E").

33. On May 11, 2012, NAPS Illini Area Vice President Wesley advised Ms. Montgomery that she had sent Plaintiff's file to "our lawyer, Charlie Scialla ... and he will file for a MSPB hearing". (See the email from Nancy Wesley, dated May 11, 2012, attached hereto and made a part hereof as Plaintiff's Exhibit "F").

34. On June 20, 2012, NAPS Illini Area Vice President Wesley faxed a request for a MSPB Hearing on behalf of Ms. Montgomery to "[o]ur lawyer, Charlie Scialla" in which she states the following:

> Attached are the first four pages of my fax to the NAPS Attorney Charlie Scialla. I also called NAPS Headquarters after I faxed Charlie. I think he is dragging his feet on this issue and another one that involved Adverse Action. I'm really trying hard to resolve every open case before I leave....

(See the facsimile transmittal and emails sent by NAPS Illini Area Vice President Wesley just before her retirement to "Attorney Charles Scialla", attached hereto and made a part hereof as Plaintiff's Exhibit Group "G").

## V. ACCEPTANCE BY DEFENDANTS OF RESPONSIBILITY
## TO PROVIDE REPRESENTATION FOR PLAINTIFF
## BEFORE UNITED STATES MERIT SYSTEMS PROTECTION BOARD

35. Ms. Montgomery received approval from NAPS that she would be provided legal representation on an appeal of her removal before the Merit Systems Protection Board.

36. With the NAPS approval, Charles Sciallia, and Sciallia Associates, Inc. undertook the representation of Ms. Montgomery in her appeal before the Merit Systems Protection Board for her removal for allegedly failing to report an accident.

## VI. CONSIDERATION SUPPORTING THE AGREEMENT
## AMONG THE PARTIES

37. Having paid the union dues of the National Association of Postal Supervisors, Ms. Montgomery is entitled to all the rights and benefits of NAPS membership.

38. The consideration for the agreements being made among the parties to represent Ms. Montgomery on her appeal before the Merit Systems Protection Board, Docket No. CH-0752-13-0029-1-1 was, on the one hand, Ms. Montgomery's membership in NAPS and the union dues she had paid over the years.

39. The consideration for the agreements to represent Ms. Montgomery, on her appeal before the Merit Systems Protection Board, Docket No. CH-0752-13-0029-1-1 was, on the other hand, the promises, assurances and representations made by the Defendants NAPS and Charles Sciallia that, upon approval, NAPS members would be afforded legal representation in removal proceedings.

40. The oral representations and written documents set forth above and the dates upon which each of those representations were made and documents presented by Defendants NAPS, the "Law Practice of Scialla Associates Inc.", and "Charles Scialla, Esq.", and "William Simpson, Esq." led Ms. Montgomery to reasonably believe that she was being represented before the United States of America Merit Systems Protection Board in Chicago by licensed attorneys authorized to practice before that tribunal.

## VII. THE "REPRESENTATION" OF PLAINTIFF BEFORE THE UNITED STATES MERIT SYSTEMS PROTECTION BOARD

41. On July 10, 2012, the Chief Administrative Judge of the US Merit Systems Protection Board sent a letter to Defendant William Simpson of Scialla Associates, indicating in pertinent part:

> Today, we received an appeal from your client, Ms. Jean R. Montgomery. According to the appeal, she has not received a final decision letter from the U.S. Postal Service regarding a removal action. It is the Board's policy to return prematurely filed appeals when no final decision has been issued.
>
> You may refile your appeal with the Board within 30 days after the effective date of the action or 30 calendar days from receipt of the final decision, whichever is later.

(A copy of the letter from the Chief Administrative Judge of the US Merit Systems Protection Board, dated July 10, 2012 is attached hereto and made a part hereof as Plaintiff's Exhibit "H").

## A. DEFENDANTS SCIALLA AND SIMPSON
## HOLDING THEMSELVES OUT AS ATTORNEYS

42. After receipt of the July 10, 2012 letter from the Chief Administrative Judge of the US Merit Systems Protection Board, the appropriate forms for the Merit Systems Protection Board, Chicago Illinois were filled out and signed by "Charles Scialla Scialla Associates" indicating that Scialla Associates, Inc. and William Simpson would be Ms. Montgomery's representative on the appeal while the signature block for making the designation of the representative effective was never signed by Ms. Montgomery. (Appellant and Agency Information Form, signed by Charles Scialla on October 3, 2012, and bearing the Stamp of the Merit Systems Protection Board, Chicago Illinois indicating receipt on October 10, 2012 is attached hereto and made a part hereof as Plaintiff's Exhibit "I")

43. Defendant William Simpson of Scialla Associates, Inc. undertook the representation of Ms. Montgomery on her appeal before the Merit Systems Protection Board, Docket No. CH-0752-13-0029-1-1, all the while Ms. Montgomery believing that William Simpson was an attorney licensed to practice law.

44. William Simpson signed and filed documents in Docket No. CH-0752-13-0029-1-1 as "William S. Simpson, Scialla Associates, Appellant's Representative" and received documents from the Court and opposition counsel directed to "William Simpson, Esq., Scialla Associates, Inc.   (The various documents filed on behalf of Jean A. Montgomery in that cause are attached hereto and made a part hereof as Plaintiff's Exhibit "J", Plaintiff's Group Exhibit "K", Plaintiff's Exhibit "L", and Plaintiff's Exhibit "M").

45. The written documents and oral statements heretofore set forth evidence that Defendants NAPS, Charles Scialla, Williams Simpson, and Scialla Associates, Inc. entered into an agreement with Ms. Montgomery whereby Defendants would and did represent her on the appeal before the Merit Systems Protection Board, Docket No. CH-0752-13-0029-1-1.

46. The oral and written promises and representations made by NAPS, Charles Scialla, and Scialla Associates, Inc. reassured Ms. Montgomery that she was being represented by attorneys licensed to practice law before the United States Merit Systems Protection Board.

### B. THE BREACH OF THE AGREEMENT BY DEFENDANTS

47. Throughout the duration of the agreement as evidenced by the written documents and oral representations set forth above, Ms. Montgomery performed all the terms and conditions of such an agreement on her part to be performed as she paid and kept current the payment of her dues as a member of NAPS.

48. Defendants NAPS, Charles Scialla, William Simpson, and Scialla Associates, Inc. intentionally and deliberately failed to perform the terms and conditions of the agreement on their part to be performed.

49. With full knowledge and consent of NAPS and Scialla Associates, Inc., Defendants Charles Scialla and William Simpson continued to represent Ms. Montgomery and hold themselves out as attorneys at law licensed to practice law and represent other persons before the Merit Systems Protection Board.

## C. DEFENDANTS CHARLES SCIALLA AND WILLIAM SIMPSON
## NEVER LICENSED TO REPRESENT PLAINTIFF
## BEFORE THE UNITED STATES MERIT SYSTEMS PROTECTION BOARD

50. At no time during their appearance before the Merit Systems Protection Board and their representation of her did Ms. Montgomery know or realize that Defendants Charles Scialla and William Simpson were not and have never been licensed to represent other person and to practice law in any forum in the United States of America whatsoever.

51. According to the laws of the State of Illinois, it is well established that only persons duly admitted to practice law in the State of Illinois may appear on behalf of other persons.

52. According to the laws of the United States America and the laws of the State of Illinois, individuals are permitted to litigate *pro se*, though not to represent other litigants.

53. The normal effect of a person's unauthorized practice on behalf of a party is to require dismissal of the cause or to treat the particular actions taken by the representative as a nullity.

54. Only licensed attorneys can represent other persons in legal actions, and the unauthorized legal practice requires dismissal of a cause.

55. The purpose of the rule is to protect litigants against the mistakes of those ignorant of the law and the schemes of the unscrupulous, and to protect the

court itself in the administration of its proceedings from those lacking requisite legal skills.

### 1. FAILURE TO ADEQUATELY INFORM MONTGOMERY AND RECEIVE AN INTELLIGENT WAIVER OF HER STATUTORY RIGHT TO REPRESENTATION BY LAWYER

56. Before proceeding in Merit Systems Protection Board, Docket No. CH-0752-13-0029-1-1, the Administrative Law Judge was required to fully advise Ms. Montgomery of her right "not simply to be represented, but representation by an attorney" licensed to practice law before the Merit Systems Protection Board:

> A claimant has a statutory right to counsel at a disability hearing. If properly informed of the right, the claimant may waive it. To ensure a valid waiver of counsel, we require the ALJ to explain to the pro se claimant (1) the manner in which an attorney can aid in the proceedings, (2) the possibility of free counsel or a contingency arrangement, and (3) the limitation on attorney fees to 25 percent of past due benefits and required court approval of the fees. (Internal citations omitted).

(See *Binion v. Shalala*, 13 F.3d 243, 245 (7th Cir.1994)).

57. The Administrative Law Judge cannot presume that Ms. Montgomery waived her right to counsel simply because she appeared at the Merit Systems Protection Board with a non-attorney Representative from her Union. (See *Beth v. Astrue*, 494 F.Supp.2d 979, 1001 (E.D. Wisc. 2007)).

58. Pertinent portions of the transcripts of the hearing in Merit Systems Protection Board, Docket No. CH-0752-13-0029-1-1 demonstrate that the Administrative Law Judge did not inform Ms. Montgomery of her statutory rights to legal counsel and to waive representation by counsel and did not give any

indication that he knew that Simpson was not an attorney licensed to practice law. (Pertinent portions of the transcripts of the hearing in Merit Systems Protection Board, Docket No. CH-0752-13-0029-1-1 are attached hereto and made a part hereof as Exhibit N).

## 2. SIMPSON AND SCIALLA FILING DOCUMENTS AS MS. MONTGOMERY'S REPRESENTATIVE

59. Defendants William S. Simpson and Charles Scialla as members of Scialla Associates, Inc. filed many documents on behalf of Ms. Montgomery as "Appellant's Representative" before the Merit Systems Protection Board that led Ms. Montgomery to believe that they were licensed to practice law and represent her before the Merit Systems Protection Board.

60. During the pendency of the litigation before the Merit Systems Protection Board, Defendants Charles Scialla and William Simpson regularly and repeatedly filed documents and led the Administrative Law Judge and Counsel for the United States Postal Service to refer to them as Charles Scialla, Esq., and William Simpson, Esq.

## 3. THE FRAUD PERPETRATED BY DEFENDANTS MISLEADS ALL PARTIES TO THE LITIGATION

61. At no time during the pendency of the litigation before the Merit Systems Protection Board did Defendants NAPS, Charles Scialla, William Simpson, and/or Scialla Associates, Inc. ever advise Ms. Montgomery or anyone else in the proceedings that no one on her defense team was licensed to practice law and

therefore they were precluded from representing her and thereby perpetuated the masquerade of their absence of any law certification.

## D. DEFENDANTS' INADEQUATE REPRESENTATION OF PLAINTIFF BEFORE THE UNITED STATES MERIT SYSTEMS PROTECTION BOARD

62. During the prosecution of her defense before the Merit Systems Protection Board in Chicago, Illinois, Defendant William Simpson failed to emphasize, develop, and capitalize upon important facts of the case:

a. The alleged date of the accident (ie. the dogbite of the Letter Carrier Ronald Ford) was October 22, 2011.

b. The first knowledge that Jean Montgomery had of the dogbite incident was on November 9, 2011 when Investigator Gilbert Lopez interviewed her in the presence of Area Manager Loretta Wilkins and one of his employees.

c. Customer Service Operations Manager (CS0M) Loretta Wilkins and the Manager of Post Office Operations (MPOO) Wanda Prater had long shown a hostility towards Station Manager Jean Montgomery and other members of management in Chicago District. (See Plaintiff's Exhibits "R" through "Z", all of which affidavits, emails, and statements had been given by Plaintiff Montgomery to Defendant Simpson to prepare her defense).

d. Other members of management of the Postal Service had long warned Station Manager Jean Montgomery to watch her back because Wilkins and Prater "were out to get her".

e. Letter Carrier Erik Coates had been removed from the Postal Service for failure to maintain regular attendance issued by his supervisor, Vicki L.

Barnes with concurrence from Jean Montgomery in March 2011. (A copy of the Notice of Proposed Removal of Erik Coates, dated March 30, 2011 is attached hereto and made a part hereof as Plaintiff's Exhibit "O").

f.  When Loretta Wilkins and Wanda Prater got promoted as Area Manager and MPOO in August 2011, becoming the supervisors of Jean Montgomery, they brought Erik Coates back to work for the Post Office in September 2011.

g.  Shortly after he gave his testimony before the Merit Systems Protection Board against plaintiff Montgomery, Erik Coates was terminated for a second time by the post office for theft of mail, but defendant Simpson made no attempt to bring the fact that he had been terminated for dishonesty to the attention of the Merit Systems Protection Board.

h.  The dates on statements received from Union Steward Ross, Letter Carrier Erik Coates, and Letter Carrier Jabiar Lanier are November 15, 2011.

i.  November 15, 2011 is the same date of the emergency replacement of Station Manager Jean Montgomery.

j.  Letter Carrier Ronald Ford had given three different statements regarding the dogbite incident, dated November 3, 2011, November 7, 2011, and one of them undated.

63. During the prosecution of her defense before the Merit Systems Protection Board in Chicago, Illinois, Defendant William Simpson failed to

adequately represent Ms. Montgomery in many ways, including, for example, the following:

    a. Exhibits were routinely shown to the adverse witnesses without any objection whatsoever from Defendant Simpson before any questions were being asked and/or without any indication that they needed to have those exhibits before them; and

    b. Without any objection from Defendant Simpson, exhibits were admitted into evidence and shown to adverse witnesses that were replete with hearsay statements and improper conclusions.

64. During the prosecution of her defense before the Merit Systems Protection Board in Chicago, Illinois, Defendant William Simpson failed to adequately represent Ms. Montgomery, for example, but not limited to, in the following:

    a. Adverse witnesses were allowed to give long narrative answers to leading questions from counsel for the Postal Service without any objection or interruption from Defendant Simpson;

    b. Defendant Simpson failed to develop and capitalize upon the testimony from Letter Carrier Ford wherein that testimony indicated that:

        i. Letter Carrier Ford believes Ms. Montgomery was a dedicated informed Station Manager for the United States Postal

Service because she was always in the station when he arrived for work and was still there when he left work;

ii.  Although Letter Carrier Ford was bitten by a dog on October 22, 2011, he had delivered a writing to his Union Steward on October 23, 2011 indicating that he did not want to file an Accident Report about being bitten by the dog. (A copy of Letter Carrier Ford's statement written to his union, dated and signed on October 23, 2011, and indicating that he did not want to file an Accident Report is attached hereto and made a part hereof as Plaintiff's Exhibit "P").

iii. The first written report by Letter Carrier Ford of being bitten by the dog was written on November 3, 2011 after he was approached by Investigator Gilbert Lopez who was conducting an  investigation at the request of Area Manager Loretta Wilkins of Ms. Montgomery's failure to report the dog bite;

iv. The written report given by Letter Carrier Ford differed from the notes that Investigator Gilbert Lopez had made on November 14, 2011 during his oral interview of Letter Carrier Ford indicating that he was bitten by the dog two hours earlier while delivering mail.

c. Defendant Simpson failed to develop and capitalize on the testimony of adverse witness, Letter Carrier Eric Coates although he had been

terminated from the post office for Attendance Violations by Supervisor Vicki Barnes and Jean Montgomery, only to be reinstated by area manager Wilkins and MPOO Prater just six weeks before providing his statement against Jean Montgomery. He was terminated for a second time for theft of mail shortly after testifying against plaintiff.

d. Defendant Simpson failed to develop and capitalize, for example, upon the testimony from Investigator Gilbert Lopez who indicated the following:

    i. Investigator Lopez first talked to Area Manager Wilkins on November 4, 2011 and then went out to talk to Letter Carriers;

    ii. Investigator Lopez did not talk to or seek permission from Station Manager Montgomery on November 4, 2011 before he went out to interview the Letter Carriers;

    iii. Without objection from Defendant Simpson, Investigator Gilbert Lopez was allowed to testify about his interviews of "the first group of letter carriers he talked to" who admittedly "only knew of the dog bite incident by hearsay";

    iv. Without objection from Defendant Simpson, Investigator Gilbert Lopez testified that he finally talked to Letter Carrier Eric Coates who had been out with Letter Carrier Ford on the date of the dogbite incident but only when delivering the mail after the dogbite incident and on a different route.

(a) Defendant Simpson failed to interrogate Investigator Gilbert Lopez about his knowledge of the fact that Letter Carrier Erik Coates had previously been terminated by Supervisor Vicki L. Barnes with concurrence from Jean Montgomery in March 2011, only to be reinstated by Area Manager Wilkins and MPOO Prater just weeks before he gave his statement indicating Ms. Montgomery had told him to mind his own business.

(b) Defendant Simpson never attempted to supplement the record with the fact that shortly after Coates gave his statement against Montgomery that was used before the Merit Systems Protection Board, Coates was terminated a second time from the post office for theft of mail, a crime of dishonesty. (See Plaintiff's Exhibit "O").

v. Without any objection from Defendant Simpson regarding hearsay, Investigator Lopez testified that Letter Carrier Coates reported to him that Coates asked Ms. Montgomery about "the dogbite accident" and Ms. Montgomery told him, "mind your own business";

(a) Defendant Simpson later avoided any cross-examination of Letter Carrier Coates or mention of the fact that Coates had been separated from the post office by Supervisor Vicki L. Barnes with the concurrence of Jean Montgomery in March

23

2011 only to be reinstated by Area Manager Wilkins and
MPOO Prater just six weeks after providing his statement
against Montgomery that was used before the Merit Systems
Protection Board, only to be terminated again weeks later for
theft of mail, a crime of dishonesty.

vi. Investigator Gilbert Lopez knew even before he interviewed
him that Letter Carrier Ford had delivered a writing to his
Union Steward on October 23, 2011 indicating that he did not
want to file an Accident Report about being bitten by the dog.
(See Plaintiff's Exhibit "P").

vii. Although Investigator Gilbert Lopez had finally interviewed
Letter Carrier Ford on November 14, 2011, Investigator
Lopez failed to notice that his notes of the interview revealed
that Letter Carrier Ford was claiming in the oral interview
that he was bitten by the dog two hours earlier while
delivering mail.

viii. When he got around to interviewing Ms. Montgomery on
November 9, 2011, Investigator Gilbert Lopez's notes
indicated that she told him that as he was questioning her,
that was the first she was hearing that Letter Carrier Ford
had been bitten by a dog on October 22, 2011.

65. During the prosecution of her defense before the Merit Systems Protection Board in Chicago, Illinois, Defendant William Simpson failed to adequately represent Ms. Montgomery in that he sat quiet and failed to interject or object when counsel for the Postal Service would ask leading questions of Area Manager Wilkins and MPOO Wanda Prater who testified in angry and accusatorial tones and would answer with long narrative answers replete with hearsay and conclusions that were far removed from the allegations under consideration in the case:

    a. Of particular concern was the 27-minute direct examination and the 26-minute redirect examination of Area Manager Wilkins in which she testified in an angry and accusatorial tone without interruption or objection from Simpson[2] who sat silently as Area Manager Wilkins testified making the following prejudicial and hostile statements:

        i. Montgomery only had negativity toward everything that Area Manager Wilkins suggested;

        ii. Area Manager Wilkins claimed Englewood was the most dangerous postal service area of the city;

        iii. Area Manager Wilkins claimed Montgomery would not explain why she had five Letter Carriers out on her Attendance Report.

---

[2] Except for a single objection which was promptly sustained prohibiting the admission of another complaint aa immaterial and irrelevant to the cause.

iv. Area Manager Wilkins claimed Montgomery would not explain how she would get attendance up to 95% which was a goal that had been set;

 (a) But Donald P. Nichols had emailed all management under his supervision "Report the Truth":

> If you are getting in trouble because your CSOM will be mad at you if you report the truth. I again reminded everyone, that nothing can happen to anyone in delivery in this district without me. Do not risk your job over the fear your CSOM being mad over you telling the truth. If you receive instructions and raise questions to anything that I have ever said in writing or in any meeting, I am to be personally contacted.

(See the email from Donald R. Nichols, dated November 21, 2011, attached hereto and made a part hereof as Plaintiff's Exhibit "Q", which had been shared by Plaintiff Montgomery with Defendant Simpson in order to prepare her defense);

v. Area Manager Wilkins claimed Montgomery accused Wilkins of harassment;

vi. Area Manager Wilkins claimed Montgomery accused Wilkins of intimidation;

vii. Area Manager Wilkins claimed Montgomery refused to talk to her;

viii. Area Manager Wilkins claimed Montgomery required Wilkins to put her instructions to her in writing, a requirement that angered Wilkins and Prater;

ix. Area Manager Wilkins and MPOO Prater claimed Montgomery was the only Station Manager with whom they claimed they had any problems;

    (a) But see the affidavits, emails, and statements from other members of post office management and employees, all of which were provided by Plaintiff Montgomery to Defendant Simpson in order to prepare her defense, attached hereto and made a part hereof as Plaintiff's Exhibits "R" through "Z".

x. Area Manager Wilkins claimed, "Montgomery threatened to call the police on me. She just jumped up and hollered, 'Get away from me. Get away from me!'"

(a) Area Manager Wilkins claimed that other managers besides Jean Montgomery confirmed that they had gotten an important email from Area Manager Wilkins and she wanted them to sign a document indicating that they got the important message.

(b) Area Manager Wilkins claimed that Montgomery refused to sign the document and hollered, "Get away from me."  It was really humiliating.

    (i) But see the email from Jean Montgomery to Area Manager Loretta Wilkins, dated October 28, 2011 complaining that it was Wilkins who was screaming at her. (A copy of the email

from Jean Montgomery, dated October 28, 2011 is attached hereto and made a part hereof as Plaintiff's Exhibit AA).

(b) Area Manager Wilkins claimed she called Ms. Montgomery and asked to see her on the work room floor, but "She completely ignored me."

(c) Area Manager Wilkins claimed that Montgomery said she was going to call the police because Wilkins was harassing her

(d) Area Manager Wilkins claimed, "Ms. Montgomery was totally ignoring me."

(e) Area Manager Wilkins testified, "Mind you, I am her manager. She would holler at me on the phone! I am just trying to get information. She hangs up the phone on me."

xi. Area Manager Wilkins claimed she found a whole package of money orders unsecured in a file cabinet in Ms. Montgomery's station and opined:

(a) "Anybody could take them out and cash them. I made a copy of the ones I found. Those money orders should have been put into a safe system."

(b) "I found the money orders in a black file cabinet in the Englewood station. I could not determine when the money orders were issued."

(c) "All Station Managers are accountable for money orders."

28

(d) "Once Money Orders are obsolete and no longer of value they are to be destroyed."

xiii. Area Manager Wilkins testified, "There was no Accountable Log."

(a) "There was no kind of accountability or Accountable Log for area keys."

(b) "There is a system that when a postal carrier does not have a key, you should report it immediately to a manager or supervisor."

(c) "There was no log regarding the keys that the carriers were using."

(d) "There was no log and no accountability for any area keys."

xiv. Area Manager Wilkins admitted under oath that she cannot say that the Post Office lost any money as a result of the activities of Ms. Montgomery.

b. During the 91 ½ minute direct examination of Area Manager Loretta Wilkins, she gave long narrative answers delivered in an angry and accusatorial tone before the Administrative Law Judge without interruption as Defendant Simpson sat silently and failed to interject any objections.

i. During his 23 minute cross examination of Area Manager Loretta Wilkins, Defendant Simpson failed to question her at all concerning the above mentioned highly prejudicial, detrimental, and the hostile opinions and statements concerning Jean Montgomery.

c. During the 27 minute direct examination of Manager of Post Office Operations (MPOO) Wanda Prater, she gave long narrative answers delivered in an angry and accusatorial tone before the Administrative Law Judge without interruption as Defendant Simpson sat silently and failed to interject any objections.

    i. During his 7 ½ minute cross examination of Manager of Post Office Operations (MPOO) Wanda Prater, Defendant Simpson failed to question her at all concerning the above mentioned highly prejudicial, detrimental, and the hostile opinions and statements concerning Jean Montgomery.

d. During his cross examination of Area Manager Loretta Wilkins and/or his cross examination of MPOO Wanda Prater, Defendant Simpson did elicit the following testimony:

    i. Area Manager Loretta Wilkins was not present when Investigator Lopez interviewed the Letter Carriers about the dog bite incident on November 4, 2011.

    ii. Investigator Lopez did give Area Manager Wilkins an update on November 6, 2011 of what was doing in his investigation.

    iii. Area Manager Wilkins and MPOO Prater did not do anything to investigate the case on their own and relied on Investigator Lopez's report to make the final decision about that which Ms. Montgomery would be charged.

iv. Area Manager Wilkins was present at the meeting on November 9, 2011 when Investigator Lopez interviewed Ms. Montgomery and she told them that was the first time she was hearing that Letter Carrier Ford had been bitten by a dog.

v. Area Manager Wilkins is the one who proposed the removal of Ms. Montgomery.

vi. Area Manager Wilkins and MPOO Prater did not know that Investigator Lopez's report and the notice of his interview revealed: "Letter Carrier Ford had completed his route sometime around 4:30 PM before he was bitten by the dog" although his written statement indicates the dog bite incident occurred while he was delivering mail at 6:00 PM.

vii. Area Manager Wilkins made the Emergency Suspension and Replacement of Ms. Montgomery on November 15, 2011 because she was convinced that Montgomery did not report the accident and follow postal policies and did not notify her fiefdom.

viii. Before November 9, 2011, Area Manager Wilkins and MPOO Prater had never accused Ms. Montgomery of failing to report the dog bite accident.

ix. After Montgomery was suspended and left the station, there was a security station review -- not a station accountability review--when the new manager took over.

31

66. During the prosecution of her defense before the Merit Systems Protection Board in Chicago, Illinois, Defendant William Simpson failed to adequately represent Ms. Montgomery in that he failed to interview and call the following important witnesses on behalf of Ms. Montgomery although, in writing, she had identified them, provided supporting emails from many of them, and requested that they be called to give testimony in her behalf:

    a. Daniel P. Davis-- from Toledo, Ohio who had given a written statement that Ms. Montgomery was the best performing postmaster in the City of Chicago under his supervision when he was in Chicago District. Her dedication was very clear as she worked 60 hours per week. And although he does not know the circumstances of the discipline against her, he knew that people targeted her, he did not approve of it, and would not give her disciplinary action against the directions from his boss. (A copy of the written statement from Postmaster Daniel P. Davis is attached hereto and made a part hereof as Plaintiff's Exhibit "R").

    b. Lynn A. Johnson -- Manager from the Fort Dearborn Post Office, Chicago District who was prepared to state that she had attended many meetings with all of the city managers present over the past 10 to 15 years and she had never seen Jean Montgomery act disruptively. (A copy of the email from Manager Lynn A. Johnson is attached hereto and made a part hereof as Plaintiff's Exhibit "S").

c. Patricia J Singleton -- Manager from the James Worsham Post Office, Chicago District was prepared to state that she has been attending the citywide meetings since 2011 and she has never witnessed anyone display any insubordination or disrespect to the authority of Loretta Wilkins. In particular, she never witnessed Ms. Montgomery showed disrespect to Area Manager Wilkins. She specifically recalls Ms. Montgomery receiving recognition at the meetings for her services to the post office. (A copy of the email from Manager Patricia A. Singleton is attached hereto and made a part hereof as Plaintiff's Exhibit "T").

d. Robert Harris, Jr. -- Manager Customer Service at the Ogden Park Station, Chicago District would testify that he had known and worked with Ms. Montgomery for over 30 years. He found her to be a very dedicated U.S. Postal Service employee who worked hard, was selfless and driven, was a trusted employee who not only opened but also closed the Englewood Station on many occasions. Mr. Harris also indicated that he never observed Ms. Montgomery to be disruptive at any of the numerous Chicago District Citywide Meetings he attended with her. (A copy of the email from Manager Customer Service Robert Harris, Jr. is attached hereto and made a part hereof as Plaintiff's Exhibit "U").

e. Theresa Starr -- Manager Customer Service at the Northtown
Station, authored and signed an Affidavit speaking on the character
of Jean Montgomery and describing the EEO Charge of a Hostile
Work Environment she filed while working under MPOO Wanda
Prater. Ms. Starr goes on to describe some of the threatening and
retaliatory treatment she received from MPOO Wanda Prater. (A
copy of the Affidavit from Manager Customer Service Theresa Starr
is attached hereto and made a part hereof as Plaintiff's Exhibit "V").

f. Benny J. Green -- Postmaster from Evanston, Illinois has known
Jean Montgomery since 2008, was previously a manager in the
Chicago District postal system and has attended numerous meetings
and training sessions with her. He found her to be a dedicated
Postal Service employee. Green wrote further, "I would ask myself
how, that she managed to do what she was doing giving the limited
support she received from upper management. In short she worked
very hard. She works hard because she is selfless and driven". (A
copy of the Memorandum for Record from Benny J. Green,
postmaster, Evanston Illinois is attached hereto and made a part
hereof as Plaintiff's Exhibit "W").

g. Diane Y. Freeman, Manager, Otis Grant Collins Station, Chicago
District who has attended the majority of the all city meetings in
Chicago and has not once ever observed any disruptive, loud, or

unprofessional behavior by Jean Montgomery. (A copy of the email from Diane Y. Freeman, Manager, Otis Grant Collins Station is attached hereto and made a part hereof as Plaintiff's Exhibit "X").

h. Leathel Franklin, Supervisor Customer Service, Roberto Clemente Station, Chicago District who has known Ms. Montgomery for several years and been in attendance at Citywide Meetings of postal management with her on many occasions. Never at any time has Ms. Montgomery behaved unprofessionally. (A copy of the email from Leathel Franklin, Supervisor Customer Service, Roberto Clemente Station is attached hereto and made a part hereof as Plaintiff's Exhibit "Y").

i. Bonita C. Brown -- Operations Specialist-Division Headquarters, Washington DC who prepared an Affidavit regarding the hostile workplace environment that she experienced when she was working in USPS Chicago District under Wanda Prater, Manager of Post Office Operations. In the affidavit, Ms. Brown recounts verbal abuse, character abuse from Wanda Prater. Ms. Brown also reported that Area Manager Loretta Wilkins asked her to join in a Class Action EEO case against Wanda Prater, which Ms. Brown declined to do. (A copy of the Affidavit from Bonita C. Brown -- Operations Specialist-Division Headquarters, Washington DC is attached hereto and made a part hereof as Plaintiff's Exhibit "Z").

j. Nancy Wesley -- NAPS Illini Area Vice President had many complaints and EEO charges against Area Manager Wilkins, some of which plaintiff Montgomery had shared with defendant Simpson to help him prepare her defense.

k. Melvin Ross -- the Union Steward to whom Letter Carrier Ford alleged he reported the accident two days after he was bitten by the dog, 10/24/11. Melvin Ross stated he only found out about the dog bite incident from Kathy Jefferson on Nov 4, 2011.

l. Kathy Jefferson -- the Agency alleged Kathy Jefferson submitted a statement about the dog bite incident, but the Agency did not present the statement into record.

m. Greg Harris -- previous CSOM, who told Jean Montgomery to watch her back because "Wilkins and Prater after you".

n. Joe Singh -- Previous CSOM, told by Prater and Nichols to "find a reason to get rid of Montgomery".

o. Mark Reynold -- Chicago Communicator Spokesperson who requested Jean Montgomery to be the manager official for a Postal Service Documentary shown on television on Channel 11.

p. Todd Hawkins -- former Chicago MPOO, who sent emails to the cluster informing managers that Montgomery was a model manager and suggested they contact me for information, many did for information and representation. Especially following the three

months Wilkins and Prater were promoted in August 2011 as CSOM and POOM.

q. Gladys Rice -- Supervisor James Worsham Station Chicago District who wrote to Postmaster General Donahue that CSOM did not adhere to postal rules or guidelines. (See a copy of the letter from Gladys Rice, dated April 12, 2012, attached hereto and made a part hereof as plaintiff's exhibit "BB").

q. Postal Police Dalke -- called by Wilkins to escort Ms. Montgomery out of the building when placed on Emergency Placement on November 15, 2011, for alleging not completing an accident report for November 15, 2011. There was no record of any accident yet to be completed for and accident on November 15, 2011 at Englewood - because there were none.  Repeated request regarding any such accident were made even to the Postmaster General Megan Brennan.

r. Meghan Brennan -- Postmaster General who could testify to multi notification of Chicago corruption managerial leaders. Plaintiff Montgomery notified Postmaster General Brennan of corruption in Chicago District. (See the letter written by a plaintiff to Postmaster Gen. Megan R. Brennan and Chief of Human Resources and Executive Vice President Jeffrey C. Williamson, dated August 7,

2015, attached hereto and made a part hereof as plaintiff's exhibit "CC").

s. Wanda Ford -- she requested Jean Montgomery to represent her in a grievance because her time had been deleted from system. Montgomery referred her to Nancy Wesley. Wilkins settled the grievance and Wanda Ford was paid for all the improperly deleted time under Wilkins instructions.

t. Cachita Martin -- she had been forced out as a result of harassment by Wilkins and Prater when illegal instruction were issued to falsify employee's time, Martin a 40+ year employee was issued discipline and involuntary moved from her assignment.

u. Karen Schaneck -- Postmaster (retired) contacted on November 15, 2011, regarding why Jean Montgomery was placed on Emergency Placement.

v. Herman Bingham --EEO specialist who had many discussions about the corruption in Chicago District.

p. Beverly Williams-- the Postal Service Financial Expert over Money Orders. She would validate that in no way the money-orders Wilkins and Prater allegedly found were associated to any stock assigned to Montgomery because the stock they allegedly found was from dates in 2008 when Montgomery was not even working at the Englewood Post Office.

q. Vickie Barnes -- she would testify that Jean Montgomery's supervisors were harassed and involuntary moved to another post office after Wilkins and Prater put Montgomery on emergency Placement. Vickie Barnes elected early retirement.

r. Royal Broady -- Manager Operation Program Support was called by Jean Montgomery and sent documents showing that employee time records were being falsified under the direction of and instruction from Wilkins and Prater.

s. Don Nichols -- Executive MPOO was called by Jean Montgomery and sent documents showing that employee time records were being falsified under the direction of and instruction from Wilkins and Prater. Don Nichols instructions were not to follow Wilkins nor Prater illegal instructions. His email REPORT THE TRUTH, speaks to that point. (A copy of the email from MPOO Don Nichols is attached hereto and made a part hereof as Plaintiff's Exhibit "S").

## VIII. DEFENDANTS' INADEQUATE AND INEFFECTIVE REPRESENTATION CAUSED PLAINTIFF'S REMOVAL AS POSTMASTER

67. Unbelievably, as Appellant's Representative, Defendant William S. Simpson of Scialla Associates indicated in a filing before the Merit Systems Protection Board on November 26, 2012 that he had no Exhibits to present in the case and on December 11, 2012 he indicated in a filing before the Merit Systems Protection Board that he was calling only Jean a Montgomery to "testify in her

behalf, relative to the subject adverse action". (See the signed filings by Simpson attached hereto and made a part hereof as Plaintiff's Exhibit "DD").

68. Defendants' inadequate representation of Ms. Montgomery before the Merit Systems Protection Board

(a) caused her to be removed as a postal supervisor; and/or

(b) she would have won—or even had a materially better chance of winning—the appeal of her removal if she had been represented by an attorney before the MSPB.

## IX. PLAINTIFF'S DETRIMENTAL RELIANCE
## ON DEFENDANTS' REPRESENTATIONS

69. By reason of said breaches by Defendants NAPS, Charles Scialla, William Simpson, and/or Scialla Associates, Inc., Ms. Montgomery has suffered the loss of her employment with the United States Postal Service after 44 years and 10 months of loyal service.

70. In the year 2011 the last full year of her gainful employment by the United States Postal Service, Ms. Montgomery made an annual salary of $72,153.29.

71. After Defendants NAPS, Charles Scialla, William Simpson, and/or Scialla Associates, Inc., undertook representation of her, Ms. Montgomery's annual salary decreased as follows: $59,412.83 for the year 2012; only $5012.29 for the year 2013; and $17,785.72 for the year 2014.

72. By reason of the actions of the Defendants in this cause, Ms. Montgomery sustained damages far in excess of the sum of $75,000.

## X. ADMISSIONS AND EVIDENCE PRODUCED BY DEFENDANTS PURSUANT TO LIMITED DISCOVERY REQUESTS

### A. Documented Lack of Even Minimum Effort In Defense of Jean Montgomery

73. William Simpson admits that he had telephone conversations with Jean Montgomery regarding Docket No. CH-0752-13-0029-1-1 before the United States Merit Systems Protection Board which he documented in his "call log" or "Phone Record".

74. The hand printed Phone Record kept by Defendant William Simpson demonstrate far less than even a minimal effort necessary to represent Jean Montgomery before the United States Merit Systems Protection Board. (See the handwritten Phone Record kept by Defendant William Simpson attached hereto and made a part hereof as Plaintiff's Exhibit "EE").

75. The hand printed Phone Record shows that William Simpson spent very few minutes in very short telephone calls with Jean Montgomery, Judge Monrose, and Attorney Maryl Rosen in preparation for the hearing before the MSPB.

76. An examination of the hand printed Phone Records of conversations between William Simpson and Jean Montgomery are very few minutes long, and the only phone conversations of any depth are the following:

| Date | Time | Contact Person | Comment |
|------|------|----------------|---------|
| a. 10/24/12 | 14 min. | Maryl R. Rosen | Introduced Myself-Discussed Case. No Settlement Offer |

| | | | |
|---|---|---|---|
| b. 12/7/12 | 45 min. | Jean Montgomery | Discussed Case & Prepare for Facts and Paper |
| c. 12/10/12 | 28 min. | Jean Montgomery | Discussed Facts & Issue Paper |
| d. 1/7/13 | 21 min. | Jean Montgomery | Discussed Deposition Process |
| e. 1/8/13 | 12 min. | Jean Montgomery | Discussed Deposition Process |
| f. 1/8/13 | 13 min. | Jean Montgomery | Discussed Agency's Exhibits at Deposition |
| g. 2/6/13 | 18 min. | Jean Montgomery | Discussed Appeal Decision She Lost. |

77. The hand printed Phone Records show a cursory review of the facts and issues in the case, a complete lack of review of records, a failure to investigate the claims by Jean Montgomery and her witnesses of the attempt to fabricate evidence against her, and/or any attempt to interview potential witnesses in the cause.

78. Although Jean Montgomery had provided William Simpson with a list of 43 potential witnesses and their contact information, his hand printed Phone Records do not reveal any attempt to interview any of those potential witnesses.

79. Although Jean Montgomery later provided William Simpson with signed statements and/or emails, letters, declarations, and statements from 30 potential witnesses, the hand printed Phone Records of William Simpson do not reveal that he even reviewed the statements and emails.

80. William Simpson never listed and/or offered as evidence any of the witnesses, statements, declarations, and emails provided by Jean Montgomery on her behalf seriously disputing the allegations against her at the Removal Hearing in the contested hearing before the MSPB.

### B. William Simpson Denies That He Never Received Any Training On Cross-Examination of Hostile Witnesses

81. Although William Simpson objects that such terms and phrases as "training", "cross-examination", and "hostile witnesses" are vague and ambiguous, he denies that he was never trained on the cross-examination of hostile witnesses.

82. Of course, it remains to be seen through the discovery process what training William Simpson has actually received on the cross-examination of hostile witnesses, a skill that he never demonstrated as he sat in silence and failed to interject any objections in his defense of Jean Montgomery in Docket No. CH-0752-13-0029-1-1 before the United States Merit Systems Protection Board during the long direct examinations of hostile witnesses who gave long narrative answers delivered in an angry and accusatorial tone before the Administrative Law Judge without interruption.

Yes 83. William Simpson goes even further in his Responses to Plaintiff's Requests to Admit and states, "any prejudice any party allegedly had toward Jean Montgomery was immaterial to plaintiff's hearing before the MSPB).

## C. Admissions of Failure to Interview Witnesses
### Concerning Prejudice toward Jean Montgomery

84. Charles Scalia and William Simpson admit that they never questioned Loretta Wilkins and Wanda Prater regarding any hostility or prejudice they harbored against Jean Montgomery.

85. Charles Scalia and William Simpson admit that they did not interview Loretta Wilkins and/or investigate any prejudice she had toward Jean Montgomery.

86. Charles Scalia and William Simpson admit that they did not interview Wanda Prater and/or investigate any prejudice she had toward Jean Montgomery.

87. Charles Scalia and William Simpson admit that they did not interview Erik Coates and/or investigate any prejudice he had toward Jean Montgomery.

### D. Admissions of Failure to Interview and Produce Potential Witnesses for Jean Montgomery

88. Charles Scalia and William Simpson admit that they did not interview Daniel P. Davis or call him as a witness on behalf of Jean Montgomery.

89. Charles Scalia and William Simpson admit that they did not interview Lynn A. Johnson, Manager from the Fort Dearborn Post Office, Chicago District, or call her as a witness on behalf of Jean Montgomery.

90. Charles Scalia and William Simpson admit that they did not interview Patricia J. Singleton, Manager from the James Worsham Post Office, Chicago District, or call her as a witness on behalf of Jean Montgomery.

91. Charles Scalia and William Simpson admit that they did not interview Robert Harris, Jr., Manager Customer Service at the Ogden Park Station, Chicago District or call him as a witness on behalf of Jean Montgomery.

92. Charles Scalia and William Simpson admit that they did not interview Theresa Starr, Manager Customer Service at the Northtown Station, or call her as a witness on behalf of Jean Montgomery.

93. Charles Scalia and William Simpson admit that they did not interview Benny J. Green, Postmaster from Evanston, Illinois, or call him as a witness on behalf of Jean Montgomery.

94. Charles Scalia and William Simpson admit that they did not interview Diane Y. Freeman, Manager, Otis Grant Collins Station, Chicago District or call her as a witness on behalf of Jean Montgomery.

95. Charles Scalia and William Simpson admit that they did not interview Leathel Franklin, Supervisor Customer Service, Roberto Clemente Station, Chicago District or call her as a witness on behalf of Jean Montgomery.

96. Charles Scalia and William Simpson admit that they did not interview Bonita C. Brown, Operations Specialist-Division Headquarters, Washington DC or call her as a witness on behalf of Jean Montgomery.

97. Charles Scalia and William Simpson admit that they did not interview Nancy Wesley, NAPS Illini Area Vice President or call her as a witness on behalf of Jean Montgomery.

98. Charles Scalia and William Simpson admit that they did not interview Melvin Ross, the Union Steward to whom letter Carrier Ford alleged he reported the accident two days after he was bitten by the dog, 10/24/11, or call him as a witness on behalf of Jean Montgomery.

99. Charles Scalia and William Simpson admit that they did not interview Greg Harris, previous CSOM who told Jean Montgomery to watch her back because "Wilkins and Prater are after you" or call him as a witness on behalf of Jean Montgomery.

100. Charles Scalia and William Simpson admit that they did not interview Joe Singh, previous CSOM who was told by Prater and Nichols to "find a reason to get rid of Montgomery" or call him as a witness on behalf of Jean Montgomery.

101. Charles Scalia and William Simpson admit that they did not interview Mark Reynold, Chicago Communicator Spokesperson who requested Jean Montgomery to be the manager official for a Postal Service Documentary shown on television on Channel 11 or call him as a witness on behalf of Jean Montgomery.

102. Charles Scalia and William Simpson admit that they did not interview Todd Hawkins, former Chicago MPOO or call him as a witness on behalf of Jean Montgomery.

103. Charles Scalia and William Simpson admit that they did not interview Gladys Rice, Supervisor James Worsham Station, Chicago District, or call her as a witness on behalf of Jean Montgomery.

104. Charles Scalia and William Simpson admit that they did not interview Meghan Brennan, Postmaster General or call her as a witness on behalf of Jean Montgomery.

105. Charles Scalia and William Simpson admit that they did not interview Wanda Ford, Supervisor Customer Service or call her as a witness on behalf of Jean Montgomery.

106. Charles Scalia and William Simpson admit that they did not interview Cachita Martin, Supervisor Customer Service or call her as a witness on behalf of Jean Montgomery.

107. Charles Scalia and William Simpson admit that they did not interview Karen Schaneck, Postmaster or call her as a witness on behalf of Jean Montgomery.

108. Charles Scalia and William Simpson admit that they did not interview Beverly Williams, Manager of Finance for her expertise on Postal Money Orders or call her as a witness on behalf of Jean Montgomery.

109. Charles Scalia and William Simpson admit that they did not interview Vickie Barnes, Postal Supervisor or call her as a witness on behalf of Jean Montgomery.

110. Charles Scalia and William Simpson admit that they did not interview Royal Broady, Manager Operation Program Support or call her as a witness on behalf of Jean Montgomery.

111. Charles Scalia and William Simpson admit that they did not interview Don Nichols, Executive MPOO or call him as a witness on behalf of Jean Montgomery.

112. William Simpson admits that he called only Jean Montgomery as a witness in her own behalf in Docket No. CH-0752-13-0029-1-1 before the United States Merit Systems Protection Board.

113. Neither Charles Scialla nor William Simpson are aware of any additional interview or investigation conducted of those persons identified by Jean Montgomery to obtain information to use in her defense in Docket No. CH-0752-13-0029-1-1 before the United States Merit Systems Protection Board.

### E. Proper and Competent Representation
### Would Have Made Such a Difference for Montgomery

114. The above-named witnesses favorable to Montgomery, many who had provided written statements--some of which were under oath, and who had indicated their willingness to testify and give favorable testimony for Montgomery should have been interviewed.

115. Many of those above-named witnesses were prepared to give testimony to contradict the chief witnesses against Montgomery, Wilkins and Prater and disclose their stated prejudice against her and should have been called as witnesses in her behalf..

116. The perfunctory fashion in which Charles Scalia and William Simpson represented Montgomery before the MSPB was far from reasonable and denied her of competent representation, especially since they are not licensed to practice law or train to adequately represent Montgomery.

### F. Although They Filed Documents Before the MSPB on her Behalf, Charles Scialla and William Simpson Claim They Never Had an Agreement to Represent Jean Montgomery

117. Although they filed documents on behalf of Jean Montgomery before the United States Merit Systems Protection Board and William Simpson represented her during the contested evidentiary hearing, Charles Scialla and William Simpson state there was never an agreement between either of them and Jean Montgomery concerning her representation in Docket No. CH-0752-13-0029-1-1 before the MSBP.

118. Charles Scialla and William Simpson state there was never a written retention agreement or any recordings of oral discussions between either of them and Jean Montgomery regarding her representation before the MSPB.

119. If, in fact, Charles Scialla and William Simpson never had an agreement to represent Jean Montgomery before the MSPB, the question remains as to who they were representing when they signed and filed documents in Docket No. CH-0752-13-0029-1-1 before the MSBP, the answer to which can be developed during discovery in the cause.

## F. Jean Montgomery Executes and Delivers
## The NAPS Disciplinary Defense Fund Representation Request Form

120. Defendant National Association of Postal Supervisors admits that Jean Montgomery as a member of NAPS was entitled to representation by Scialla Associates.

121. Defendant National Association of Postal Supervisors admits that Jean Montgomery executed a NAPS Disciplinary Defense Fund Representation Request Form.

122. Pursuant to the instructions on the NAPS Disciplinary Defense Fund Representation Request Form, the form was forwarded to Scialla Associates which Defendants contend is no longer in the possession of Scialla Associates due to its retention policies.

123. Discovery of what other important documents are no longer in the possession of defendants in this case awaits another day and probably will bring other problems to light.

### G. Upon Inquiry,
### Jean Montgomery Assured She Is Represented by An Attorney

124. On January 7, 2013, one week before the MSPB hearing in Docket No. CH-0752-13-0029-1-1 which commenced on January 16, 2013, Jean Montgomery was deposed by Maryl Rosen, Attorney with the Postal Service.

125. During the course of the deposition of Jean Montgomery, Attorney Rosen, the Postal Service Representative Attorney asked Montgomery what she and William Simpson had talked about.

126. Jean Montgomery responded that her conversations with William Simpson were covered by that lawyer/client confidentiality.

127. Attorney Rosen retorted, "That does not count. Simpson is not an attorney."

128. Needless to say, that is the first time that Jean Montgomery had heard such a statement.

129. Immediately after leaving the deposition, Jean Montgomery, emotionally distraught called William Simpson and questioned him about what Attorney Rosen said about him not being an attorney.

130. William Simpson stated, "Rosen was not telling the truth, and didn't know what she was talking about".

131. After the phone with William Simpson, Jean Montgomery called NAPS President Louis Atkins as his office, and was told he was not available.

132. Jean Montgomery strongly expressed to that individual in his office that it was extremely urgent that she speak to Atkins as soon as possible.

133. Jean Montgomery called Nancy Wesley, NAPS Illini Area Vice President and told her what Attorney Rosen said about William Simpson not being an attorney.

134. Jean Montgomery asked Nancy Wesley for Charles Scialla's phone number.

135. Nancy Wesley also stated that Attorney Rosen was mistaken and offered her assurance that all members of NAPS are represented by attorneys from Scialla Law Firm at MSPB.

136. Nancy Wesley said she would contact Charles Scialla and tell him what Attorney Rosen had said about William Simpson not being an attorney.

137. NAPS President Louis Atkins called Jean Montgomery back and they talked about the disconcerting information she had received at her deposition.

138. Jean Montgomery informed President Atkins what Attorney Rosen said about William Simpson not being an attorney.

139. Without any hesitation, Louis Atkins said that Attorney Rosen was not correct.

140. President Atkins said all NAPS members are represented by attorneys from the Scialla Law Firm at MSPB.

141. President Atkins went on to describe for Jean Montgomery the amount of money that "Attorney Scialla" and his firm are paid for representation of NAPS members, and that, if necessary, "Attorney Scialla" could request additional fund for representation of NAPS members at MSPB.

142. Relying on all the reassurance she had received that she was being represented by an attorney before the MSPB, Jean Montgomery went forward to her detriment with the hearing in Docket No. CH-0752-13-0029-1-1.

### H. Breach of Duty of Fair Representation

143. The foregoing recitation of facts in this the Fifth Amended Complaint based on the limited discovery already allowed in the case shows that Defendant National Association of Postal Supervisors acted "arbitrarily", "far outside a wide range of reasonableness to be rational", and in such a "perfunctory fashion" as to breach its duty of fair representation of Montgomery. See *Yeftich v. Navistar Inc.*, 722 F.3d 911 (7th Cir. 2013).

### I. The Importance of the Administrative Law Judge Receiving a Valid Waiver and Assurance Jean Montgomery Is Aware of Who Represents Her

144. Having received all the reassurance that she was being represented by an attorney before the MSPB in Docket No. CH-0752-13-0029-1-1, how much more important that the Administrative Law Judge advise Jean Montgomery of her right to have an attorney represent her and received a knowing waiver from her to proceed without an attorney.

145. Before proceeding in Merit Systems Protection Board, Docket No. CH-0752-13-0029-1-1, the Administrative Law Judge was required to fully advise Ms. Montgomery of her right "not simply to be represented, but to representation by an attorney" licensed to practice law before the Merit Systems Protection Board. As the Seventh Circuit taught us in reviewing admonishments given by the Administrative

Law Judge to a claimant at the commencement of a Social Security Administration

hearing in *Binion v. Shalala*, 13 F.3d 243, 245 (7th Cir.1994):

> A claimant has a statutory right to counsel at a disability
> hearing. If properly informed of the right, the claimant
> may waive it. To ensure a valid waiver of counsel, we
> require the ALJ to explain to the pro se claimant (1) the
> manner in which an attorney can aid in the proceedings,
> (2) the possibility of free counsel or a contingency
> arrangement, and (3) the limitation on attorney fees to 25
> percent of past due benefits and required court approval
> of the fees. (Internal citations omitted).

146. The Administrative Law Judge cannot presume that Ms. Montgomery

waived her right to counsel simply because she appeared at the Merit Systems

Protection Board with a non-attorney Representative from her Union. See *Beth v.

Astrue*, 494 F.Supp.2d 979, 1001 (E.D. Wisc. 2007).

## J. The Claim of Attorney-Client Privilege Not Available

147. In their Answers to Interrogatories, Charles Scialla and William

Simpson state among other things:

> Where [Scialla/Simpson] has agreed to produce
> documents responsive to these interrogatories, if the
> responsive documents include information that is
> subject to the attorney-client privilege, the work product
> doctrine and/or other legal privileges, [Scialla/Simpson]
> will identify those documents in a privilege log. However,
> [Scialla/Simpson] will not identify in his privilege log
> communications generated specifically in connection with
> this litigation.

148. As discussed in open court, if as alleged throughout this Complaint

Charles Scialla and William Simpson are not attorneys at law, no attorney-client

privilege ever existed between either of them and Jean Montgomery.

149. And, of course, the attorney-client privilege belongs to Jean Montgomery, and she alone can waive it.

WHEREFORE, Plaintiff Jean Montgomery prays that this Honorable Court enter an order granting the following relief:

A. Plaintiff be granted general and compensatory damages in an amount to be determined at trial;

B. Plaintiff be granted punitive or liquidated damages in an amount to be determined at trial;

C. Plaintiff be granted her costs, litigation expenses, and pre-judgment interest;

D. Plaintiff be reinstated to her position as a manager in the United States Postal Service, and

E. The Court grant such other and further relief as the Court may deem just, appropriate, or equitable in the circumstances.

Respectfully submitted,

S/ John P. DeRose
John P. DeRose

John P. DeRose & Associates
15 Spinning Wheel Road
Suite 428
Hinsdale, Illinois 60521
(630) 920-1111 Office
(630) 920-1170 Fax
john@johnderoselaw.com

**CERTIFICATE OF SERVICE**

I, John P. DeRose, hereby certify that on August 6, 2019, I electronically filed this Fifth

Amended Complaint through the Court's CMECF system, with a copy automatically served via

the Court's CMECF system upon all counsel of record.

S/ John P. DeRose
John P. DeRose

John P. DeRose & Associates
615 N. York Road
Hinsdale, Illinois 60521
(630) 920-1111 Office
(630) 920-1170 Fax
john@johnderoselaw.com