**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| JEAN A. MONTGOMERY, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 15-cv-10840 |
| | ) | |
| v. | ) | Judge Robert M. Dow, Jr. |
| | ) | |
| CHARLES SCIALLA, WILLIAM | ) | |
| SIMPSON, SCIALLA ASSOCIATES, | ) | |
| INC., and NATIONAL ASSOCIATION | ) | |
| OF POSTAL SUPERVISORS, | ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM OPINION AND ORDER**

Plaintiff Jean Montgomery worked for the United States Postal Service (USPS) until she was removed from employment in 2012. Following her termination from USPS, Montgomery fought the removal decision in an administrative appeal to the U.S. Merit Systems Protection Board (MSPB). However, in 2013, the Administrative Judge (AJ) sustained the charges against Montgomery, as well as her removal. A three-judge panel of the MSPB affirmed, and so did the U.S. Court of Appeals for the Federal Circuit.

Montgomery's unsuccessful challenge to USPS's removal decision forms the backdrop for the lawsuit now before this Court. Unable to upend USPS's decision in the administrative process or on appeal, Montgomery went on the offensive, filing a flurry of suits in federal court flowing from her employment with USPS, USPS's removal decision, and her unsuccessful appeals of the removal. Those suits allege that various actors involved in Montgomery's plight—ranging from the AJ who presided over her appeal, to a panel of Seventh Circuit judges—violated her state,

federal, and constitutional rights. To date, none of those suits have afforded Montgomery any relief.[1]

Now before this Court is one of the sole surviving legal actions. In this case, Montgomery takes issue with the quality and type of services she received from William Simpson, an advocate who represented her in the 2013 direct appeal to the MSPB. In a federal diversity lawsuit naming Simpson, Simpson's colleague (Charles Scialla), Simpson's employer (Scialla Associates, Inc.), and the association that hired Scialla Associates to represent Montgomery (the National Association of Postal Supervisors or NAPS), Montgomery alleges that Defendants pulled the wool over her eyes. According to Montgomery, Defendants breached their contract to provide—and fraudulently misrepresented that she would receive—the services of a licensed attorney in the 2013 proceedings before the MSPB. They also allegedly provided subpar professional services and therefore committed professional malpractice.

Defendants Simpson, Scialla, and Scialla Associates have moved for summary judgment [167, 168] on the single claim remaining in this case: Montgomery's allegations of professional negligence for Defendants' performance before the MSPB. Because the Court agrees with Defendants that Plaintiff's claims are time barred and fail on the merits in any event, the Court grants Defendants' motion for summary judgment [167] and denies as moot several other pending motions [171], [184], [186], and [204]. A final judgment consistent with Federal Rule of Civil Procedure 58 will issue on the federal claim. Civil case terminated.

---

[1] See *Montgomery v. Donahoe*, 2014 WL 11395173 (N.D. Ill. July 11, 2014), *aff'd*, 602 Fed. Appx. 638 (7th Cir. 2015); *Montgomery v. Brennan*, No. 15-cv-4635 (N.D. Ill.), *aff'd*, 15-3567 (7th Cir.); *Montgomery v. Brenan*, 2017 WL 951352 (N.D. Ill. Mar. 8, 2017); *Montgomery v. Manrose*, 15-cv-11083 (N.D. Ill Dec. 15, 2015), *aff'd*, No. 16-1401 (7th Cir. July 13, 2016); *Montgomery v. Wood*, No. 15-cv-6604 (N.D. Ill. Aug. 27, 2015), *aff'd*, No. 15-3098 (7th Cir. Mar. 4, 2016).

I.      **Background**

    A.      **Factual Background**

This case arises from the removal of Jean A. Montgomery from a position with the U.S. Postal Service (USPS).  Montgomery worked as the Manager of Customer Service at the Englewood Post Office in Chicago, Illinois.  [169 (Defs.' Statement of Facts ("Defs.' SOF") at ¶ 1] (citing [169-4 (Exs. to Strom Decl.), Ex. C (Initial Decision of the U.S. Merit Systems Protection Board ("Initial Decision")) at 419]).[2]  On November 15, 2011, Montgomery received an "Emergency Placement in Off-Duty Status," a form of administrative leave premised on her "disrupting day-to-day postal operations, not adhering to Postal Service safety policies, procedures and untimely reporting accidents at Englewood Station."  [169 at ¶ 14] (citing [169-4, Ex. L at 409]).  In April 2012, Montgomery received a notice from USPS proposing her removal from employment based on charges that she had failed to report an employee's accident and injuries and had failed to perform other duties.  See [169 at ¶ 15] (citing [169-4, Ex. L at 409]).  Montgomery received a discharge letter on August 30, 2012.  [169 at ¶ 16].  She was removed from employment on September 8, 2012.  [*Id.* at ¶ 1] (citing [169-4, Ex. C at 419]).

Defendant William Simpson represented Montgomery in an appeal from the action removing her from USPS.  [169 (Defs.' SOF) at ¶¶ 3, 22].  Simpson is not a licensed attorney.  Rather, he is an advocate employed by Scialla Associates, Inc., designated to represent Montgomery.  [*Id.* at ¶ 22].  At all relevant times, Scialla Associates was a collection of attorneys and non-attorneys that provided "advocates" to represent individuals, including USPS employees,

---

[2] For ease of reference, the Initial Decision is available at Exhibit C of Dkt. No. 169-4, beginning on page 419.  Pin cites refer to the page number on this Court's docket, not the pagination assigned in the underlying agency proceeding.

in hearings before the U.S. Merit Systems Protection Board (MSPB) or the MSPB's administrative judges. [169-1 (Scialla Decl.) at ¶¶ 4, 21].

Simpson represented Montgomery in the hearing on her appeal, which took place before MSPB Administrative Judge (AJ) Stephen E. Manrose on January 16, 2013. [169 (Defs.' SOF) at ¶ 33; 169-4 (Exs. to Strom Decl.), Ex. C (Initial Decision) at 419]. During the proceeding, Simpson called and questioned Montgomery and a Postal Manager named Don Nichols. [169 at ¶ 24]. The respondent agency, USPS, called a letter carried named Ronald Ford, a safety inspector named Gilbert Lopez, and Montgomery's former supervisors, Loretta Wilkins and Wanda Prater, as witnesses. Simpson cross-examined all of USPS's witnesses. [*Id.* at ¶ 24].

The removal proceedings centered on two charges: Montgomery's alleged failure to report a dog bite incident and her alleged failure to perform assigned duties. The claim before this Court implicates Simpson's performance during the January 2013 hearing before the AJ. Thus, this Court will describe each incident through the lens of the January 2013 hearing, explaining (1) what evidence Simpson and USPS presented during the hearing, and (2) the AJ's ruling on each charge and the evidence he relied upon to reach his conclusions. A full copy of the transcript of the AJ hearing is available as well. [206-2 (Montgomery Ex. 1, *Jean Montgomery v. U.S. Postal Serv.* Jan. 16, 2013 Hr'g Tr. ("AJ Hr'g Tr."))].

### 1.      Charge 1: Dog-Bite Incident

Regarding the dog-bite incident, USPS alleged that Montgomery's supervisee was bit by a dog while delivering mail and that Montgomery failed to report the incident or assist the supervisee in getting medical assistance. Specifically, on October 22, 2011, a letter carrier named Ronald Ford was attacked and bitten by a dog while on his mail delivery route. [169-4 (Exs. to Strom Decl.), Ex. C (Initial Decision) at 419–20]. Ford, Montgomery's supervisee at the time, returned

to the station revealing "obvious injuries, bleeding, and distress." [*Id.* at 420]. "Notwithstanding these circumstances, [Montgomery] instructed him to resume mail delivery and failed to report the injury as required." [*Id.*].

During the January 2013 hearing in which Simpson represented Montgomery, several witnesses testified in person and others filed written statements about the incident. The injured employee, Ford, testified in person that he informed Plaintiff about the incident and was told to resume deliveries. According to the AJ, Ford "confirmed in his testimony that he was bitten by a dog while delivering the mail." [169-4 (Exs. to Strom Decl.), Ex. C (Initial Decision) at 420]. Ford further testified that his injuries included "puncture wounds on his hand," a "'big scrape' on his leg, and that the injuries caused visible blood stains on his clothes." [*Id.*]. He also "stated he returned to the station and reported the incident to [Montgomery] while showing her the hand wound;" nevertheless, "[Montgomery] told him to return to mail delivery," "did not complete an injury report, and * * * did not recommend or direct him to seek medical treatment." [*Id.*]. Ford's written statement relayed that Montgomery "did not show any interest in [his] wellbeing." [*Id.*] Ford testified that he returned home after completing his route and sought medical treatment the next day. [*Id.*]. Among others, a USPS safety manager, Gilbert Lopez, reinforced Ford's testimony. During the hearing, Lopez testified in person that he interviewed Ford several weeks after the incident, at which point the bite wounds were still visible. [*Id.* at 421]. Lopez further testified that during interviews with Montgomery, she "denied any knowledge of the incident" but "that Montgomery did not report the incident as required on pertinent forms." [*Id.*]

Montgomery also testified in person during the proceeding. She stated that "Ford did not advise her of his injuries and that she did not become aware of the incident until November 9, 2011." [169-4 (Exs. to Strom Decl.), Ex. C (Initial Decision) at 421]. Notwithstanding that

testimony, written statements and evidence corroborated Ford's and Lopez's version of events. Medical reports showed Ford received prescription medications. [*Id.* at 420.] Further, Jabari Lanier, the substitute mail-carrier who filled in for Ford's route the day after the incident, filed a written statement that "residents on the route informed him 'there was blood all over the mail.'" [*Id.*]

Also relevant here, several individuals either provided live testimony or written statements regarding the dog bite incident, including Erik Coates and Wanda Prater. Erik Coates, another Letter Carrier, "filed a statement that Mr. Ford informed [Coates] he was instructed to deliver the mail even after he advised his supervisor of the injuries" and further stated "he also informed the appellant of Mr. Ford's injuries but she told him 'it wasn't [his] business and go deliver the mail.'" [169-4 (Exs. to Strom Decl.), Ex. C (Initial Decision) at 420] (some alterations in original). Wanda Prater, the Manager of Postal Service Operations and supervisor of Montgomery, also testified about USPS policy and procedures. She contextualized that "on-the-job accidents must be reported within twenty-four hours from when they occur." [*Id.* at 420.]

In his ruling issued February 1, 2013, the AJ made factual findings and sustained the dog-bite incident charge against Plaintiff. The AJ rejected Montgomery's "contention [that] she did not become aware of the incident until more than two weeks after" because: it was "not only disputed by * * * Mr. Ford but also by Mr. Coates;" "Ford took leave from work the day following the incident to seek medical treatment and another carrier delivered his route," which should have made Montgomery "aware of the incident," and "Ford's wounds were plainly visible, as reflected by the blood stains on his clothes and on the mail." [169-4 (Exs. to Strom Decl.), Ex. C (Initial Decision) at 421]. The AJ further "f[ound], contrary to [Montgomery's] assertion, that she did become aware of Mr. Ford's injuries shortly after they occurred[,] * * * * however, did not

6

complete required forms nor did she assist Mr. Ford in seeking required medical treatment." [*Id.*]. The AJ also concluded that assuming for the sake of argument that Montgomery did not learn of the attack until more than two weeks after it occurred, even then she failed to make the required reports and assist Ford in seeking required treatment. [*Id.*].

The AJ thus sustained the charge. [169-4 (Exs. to Strom Decl.), Ex. C (Initial Decision) at 422]. He reasoned that "[b]ased on [Montgomery's] failure to perform an elementary requirement of her job, to file a report and protect subordinate employees from harm, appropriate disciplinary cause exists to promote the efficiency of the service" and concluded that "[f]or this reason and because the charge is supported by preponderant evidence, the charge is sustained." [*Id.*].

### 2.   Charge 2: Failure to Perform Assigned Duties

The second charge against Montgomery, encompassed fourteen "specifications," *i.e.*, incidents, in which Montgomery failed to perform her assigned duties. Those fourteen incidents ranged from Montgomery's failure to comply with certain job functions and follow directions to her insubordination. The AJ again considered a range of evidence, including in-person testimony, emails and reports contained in the agency record, and written statements.

To give just a flavor of those charges, the Court notes that several incidents involved Plaintiff's alleged failure to fulfill her basic job responsibilities. For example, in the third specification, USPS alleged that Plaintiff failed to follow instructions to ensure that letter carriers completed their routes by 5:00 p.m. [169 (Defs.' SOF) at ¶ 52; 169-4 (Exs. to Strom Decl.), Ex. C (Initial Decision) at 422]. The specification "allege[d] [Montgomery] failed to follow instructions given in November 2011 to ensure that letter carriers completed their assigned routes in the allotted time." [169-4, Ex. C at 423]. The AJ found the charge supported by "documentary evidence show[ing] that many carriers under the appellant's supervision * * * did not complete

their assigned routes by 5:00 p.m. as instructed by Ms. Wilkins." [*Id.*] (citing multiple documents showing that reporting letter carriers from Englewood office were on delivery routes past 5:00 p.m.). See also [169-4, Ex. I at 631–41] (excerpts from the agency record containing the reports).[3]

As another example, the second specification alleged that Montgomery failed to submit attendance reviews or take disciplinary actions for employees who had attendance issues between October 14 and November 14, 2011. [169 (Defs.' SOF) at ¶ 51; 169-4, Ex. C (Initial Decision) at 422]. To support the incident, the agency introduced emails into the record featuring exchanges between Montgomery and Wilkins. Wilkins, for example, questioned what disciplinary actions Montgomery had taken to address the absences of her supervisees. The AJ found the incident supported by preponderant evidence as well, relying on the fact that Montgomery's response did not indicate that she had taken any action. [169-4, Ex. C at 423]. See also [*id.*, Ex. I at 647] (emails cited by AJ). The AJ stated that Montgomery "did not provide rebuttal evidence and argument showing she actually conducted attendance reviews and followed with appropriate disciplinary processes." [*id.*, Ex. C at 423].[4]

---

[3] In a similar vein, specification thirteen, alleged that a different letter carrier informed Montgomery that "she was unable to deliver all the mail on her route by 5 p.m." [169-4, Ex. C (Initial Decision) at 428]. Despite that the carrier "was afraid to continue past that time," Montgomery directed her to continue the route and refused to give her a form to report undelivered mail. [*Id.*]

To find the incident supported by preponderant evidence, the AJ relied on the letter carrier's written statement. [169-4, Ex. C (Initial Decision) at 428]. See also [169-4 (Ex. J) at 572] (letter carrier's statement cited by AJ). Wilkins' testimony also provided context for the policy: She testified that "she established a policy requiring carriers to return from their routes by 5:00 pm" because the office is "located in a high crime area" and therefore the letter carrier "had a good reason for requesting that she be excused from delivering mail past 5:00 p.m.," and Montgomery's order to the carrier "to deliver the mail past 5 p.m." therefore "violated Ms. Wilkins's policy" intent. [169-4, Ex. C at 428]. The AJ also noted that Montgomery "did not deny the facts stated in the specification and stated excess mail was scheduled for delivery because another carrier was attacked while delivering the mail." [*Id.* at 428]. The AJ again found the incident supported by preponderant evidence based on Montgomery's violation of Wilkins's policy and refusal to provide the form. [*Id.*].

[4] As yet another example, in the seventh specification, USPS alleged Montgomery failed to follow instructions regarding "area management process" mail collection. The evidence contained statements by

Several other specifications indicated that Montgomery behaved inappropriately in communicating with her colleagues. In one, Montgomery wrote to her supervisor, Wilkins, that "I [Montgomery] did not sleep around for my position, that is not to say that you [Wilkins] did, but if the shoe fits, wear it" and further told Wilkins to "put [her] ego in her purse and [her] anger where it [is] needed." [169-4 (Exs. to Strom Decl.), Ex. C (Initial Decision) at 425]. See also [*id.*, Ex. I at 646] (emails cited by AJ). The AJ concluded that Montgomery actually "admitted she made these insulting comments to her supervisor" and the incident was therefore supported by preponderant evidence. [*Id.*]. As another example of "sarcasm and derogatory statements," in response to another set of Wilkins's instructions, Montgomery stated, "[y]ou don't know how good that sounds, to hear you want to manage this office," and in a separate email responded, "I am leaving in two minutes * * * please let me know in the next minute so I won't get caught in your trap." See [*id.* at 424]. See also [*id.*, Ex. I at 603]. The AJ again found the incident supported by preponderant evidence because "the appellant did not deny sending the messages nor did she rebut Ms. Wilkins's testimony that she failed to follow her instructions." [*Id.*, Ex. C at 425].

---

USPS management stated that stations had not correctly forwarded collection mail. [169-4, Ex. C (Initial Decision) at 425–26].

The AJ's findings included a litany of documents in the agency records. See [169-4, Ex. C (Initial Decision) at 425]. In an email, Montgomery's supervisor, Wilkins, instructed Montgomery to adhere to certain procedures to avoid "noncompliance." [169-4 (Exs. to Strom Decl.), Ex. J at 697]. In another email, Tammi Wills documented issues with Englewood station where Montgomery worked, including late collection trips for the AMP collection and that Montgomery had refused to allow completion of a "late dispatch form" and took two bundles of letters back with her. [*Id.* at 700]. Further email exchanges between Wilkins and an administrative assistant "reflect[ed] the appellant did not make the collection drop * * * in time for dispatch." [169-4, Ex. C (Initial Decision) at 425]. And other documents in the record "reflect[] the later transfer of collection mail to the processing facility." [*Id.*] ("The record contains forms from September and October 2011 reflecting the later transfer of collection mail").

Overriding Montgomery's testimony that the incident was "[one] more fabrication of [Ms. Wilkins's] anger," the AJ again found the specification supported by preponderant evidence because "[t]here [was] evidence supporting the agency's contention the appellant exhibited deficient performance in forwarding AMP collection mail to the processing center." [169-4, Ex. C (Initial Decision) at 425–26].

Other incidents, however, relied more heavily on testimony by Plaintiffs' supervisors or colleagues and Plaintiffs' failure to mount a defense.  For example, in one incident, USPS alleged Montgomery "loudly screamed at Ms. Wilkins during the all-city meeting and refused to sign" a document.  [169-4, Ex. C (Initial Decision) at 426].  Wilkins testified in support of these allegations, and Montgomery denied the allegations in a written response.  [*Id.*].  The AJ reasoned that "Wilkins provided testimony supporting the specification and her testimony was not rebutted by contrary testimony from" Montgomery, and thus "despite [Montgomery's] denial in her written response," found "the specification is supported."  [*Id.* at 426].

In sum, in his February 1, 2013 ruling, the AJ concluded that the charges against Montgomery based on both (1) the dog bite incident, and (2) the failure to perform assigned duties (comprised of all 14 incidents) were supported by preponderant evidence.  Regarding the penalty, given her past disciplinary record, the AJ found that Montgomery had received notice of her performance deficiencies and the need to correct her behavior.  [169-4 (Exs. to Strom Decl.), Ex. C (Initial Decision) at 430].  The AJ also determined that Montgomery's supervisor, Wanda Prater, had considered the *Douglas* factors and testified in support of her decision, noting the requirement for employees to follow all rules and regulations.  [*Id.*].  The AJ thus sustained the charges and did not change the disciplinary sanction.

Montgomery appealed the AJ's decisions *pro se*.  A three-judge panel of the MSPB affirmed the AJ's initial decision, on October 28, 2013.  [169-4, Ex. D (Final Order of the U.S. MSPB ("Final Order")) at 437].  The Federal Circuit denied Montgomery's petition for review of her removal on June 12, 2014.  See *Montgomery v. U.S. Postal Serv.*, 566 Fed. App'x 968 (Fed. Cir. 2014).

### B.    Procedural Posture

That brings us to the instant case, an action that flows from Montgomery's failed appeal to the MSPB.  In addition to an onslaught of other federal cases that have since been dismissed (and, in many instances, affirmed by the Seventh Circuit), Plaintiff Montgomery filed this federal lawsuit *pro se* on December 2, 2015, against Defendants William Simpson, Charles Scialla, Scialla Associates, Inc., and NAPS.  The Court dismissed the complaint for failure to state a claim with leave to amend only if Montgomery could plead claims sounding in Illinois contract law under the Court's diversity jurisdiction, 28 U.S.C. § 1332.  [See 46 at 13–15].

Since Montgomery retained counsel, this Court has afforded her ample opportunities to replead.  Even with the assistance of counsel, Montgomery's first few iterations of the amended complaint fared no better because she failed to adequately allege this Court could properly exercise jurisdiction over the case.  At the time she filed her Fourth Amended Complaint, Montgomery launched more than 200 discovery requests. [100].  The Court granted Defendants' motion to limit discovery in part but ordered discovery to assist Montgomery in pleading the elements of her contract claim, including breach based on the adequacy of Defendants' representation.  [107].  Ultimately, Montgomery filed her Fifth Amended Complaint, see [163] (operative for the motions now before this Court), which Defendants again moved to dismiss.  [117].  The Court found that although her primary claims for breach of contract and fraudulent misrepresentation did not state a claim for relief, Montgomery could proceed on a claim for professional negligence against Defendants Simpson, Scialla, and Scialla Associates, Inc.  [135].

Six years after the initiation of this lawsuit and following years of discovery under the supervision of Magistrate Judge Finnegan, Defendants moved for summary judgment. [167] [168 (Defs. Charles Scialla, William Simpson, & Scialla Associates, Inc.'s Mot. for Summ. J. ("Defs.'

Br.")]. Defendants filed a conventional opening brief [168] that identifies their version of the undisputed facts and argues that Montgomery has failed to raise a triable issue on the elements of her professional negligence claim.

At that juncture, convention went out the window. After the Court granted Plaintiff an extension that afforded her nearly two months to respond [200], Plaintiff filed a response of fifteen pages [206 (Pl.'s Mem. of Law in Opp'n to Defs.' Mot. for Summ. J. ("Pl's. Br."))],[5] many exhibits, and Rule 56.1 statements. The Plaintiff's Rule 56.1 Statements of Facts and Responses [208, 209] are out of conformity with this District's local rules. More problematic, however, is the extent to which Montgomery's brief in opposition to summary judgment [206] fails to resemble a legal brief as it is devoid of any citations to legal authority—not a single statute or case.

After defense counsel filed its reply brief [211], which pointed out the defects in Plaintiff's brief, the case continued to take odd turns. Several weeks after defense counsel called the defects in the brief to Plaintiff's counsel's attention, Plaintiff sought leave to supplement. See [213 (Pl.'s Mot. for Leave to File Suppl. *Nunc Pro Tunc* Her Mem. of Law in Opp'n to Mot. for Summ. J.) at ¶ 1]. This Court denied the motion, explaining that allowing a supplemental brief long after Defendants had filed their reply brief would "introduce avoidable additional litigation costs as well as delay in processing cases toward resolution." [215 at 1]. What is more, the supplemental brief was "both too little * * * and too late." [*Id.* at 2]. That proposed brief contained boiler-plate language containing the summary judgment standard and only cited a single other case, *Ortiz v. Werner Enterprises, Inc.*, 834 F.3d 760, 765 (7th Cir. 2016), that has nothing to do with the professional negligence claim at issue. [*Id.*]; [213-1 at 7]. In other words, even if the Court had

---

[5] Filing [207] appears to be a duplicate of [206]. Therefore, the Court will refer to [206] for simplicity.

accepted the supplemental brief, it would not have supplied any relevant legal argument on the sole claim left to be resolved.

In the months following, more motion practice ensued. Defendants moved to strike certain allegations in the operative complaint [171], and Montgomery moved to strike Defendants' answer and affirmative defenses [184]. Montgomery then moved to compel Defendants' answers to discovery requests and for enforcement of third-party subpoenas [186], and later sought leave to issue subpoenas for deposition of seven witnesses [204].

Defendants' motion for summary judgment [167] and all four motions regarding pleadings and discovery that followed [171], [176], [186], and [204] are now before this Court.

## II. Legal Standard

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine dispute as to any material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "On a motion for summary judgment, the moving party has the burden of demonstrating that there are no genuine questions of material fact and that he is entitled to judgment as a matter of law." *Green v. Whiteco Indus., Inc.*, 17 F.3d 199, 201 (7th Cir. 1994). "Once a party has made a properly-supported motion for summary judgment, the opposing party may not simply rest upon the pleadings but must instead submit evidentiary materials that 'set forth specific facts showing that there is a genuine issue for trial.'" *Harney v. Speedway Superamerica*, 526 F.3d 1099, 1104 (7th Cir. 2008) (quoting Fed. R. Civ. P. 56(c)). In evaluating a motion for summary judgment, the Court construes all facts in the light most favorable to the

nonmoving party and draws all reasonable inferences in favor of the nonmoving party. *Bell v. Taylor*, 827 F.3d 699, 704 (7th Cir. 2016).

## III. Analysis

### A. Motion for Summary Judgment [167, 168]

In their brief in support of summary judgment [168], Defendants submit four, independent grounds for judgment as a matter of law. First, they assert that Simpson did not proximately cause Montgomery to lose her appeal to the MSPB before the AJ. Second, they contend that Simpson did not breach the standard of care, and in their reply in support of summary judgment [211] they add that without expert testimony, Montgomery cannot meet her burden of proof, [*id.* at 4]. Third, they submit that Montgomery's professional negligence claim is barred by the statute of limitations that governs attorney malpractice actions. Fourth and finally, also in reply [211], they add that Montgomery's failure to develop any law or fact in support of her opposition to Defendant's motion for summary judgment waives any entitlement to proceed to trial on her claim.[6]

The Court will address Defendants' statute of limitations and proximate cause arguments in detail, concluding that each presents an independently persuasive reason for the entry of judgment for Defendants and against Plaintiff. As a preliminary matter, however, the Court will briefly discuss waiver, explaining that while it will not resolve this case on that ground alone, it will not entirely disregard Plaintiff's waiver, either. Instead, the Court will weave Plaintiff's waivers throughout the remainder of this opinion so as to show how they interact with the dispositive issues in the case.

---

[6] As for the remaining Defendants, they argue that Scialla did not participate in Montgomery's representation before the MSPB and there is no other basis for liability because corporate officers are not subject to tort liability simply by virtue of their holding office. Regarding Scialla Associates, Inc., they argue that an employer's liability rises and falls with the entity's agents, and since there is no underlying negligence claim against Simpson and Scialla, the entity is not liable either.

### 1. Waiver

Defendants argue in their reply brief [211]—on the basis of the highly unusual brief that counsel submitted in opposition to the motion for summary judgment—that Montgomery has abandoned her professional negligence claim altogether. "The non-moving party waives any arguments that were not raised in its response to the moving party's motion for summary judgment." *Nichols v. Michigan City Plant Plan. Dep't*, 755 F.3d 594, 600 (7th Cir. 2014). While different waiver and forfeiture rules govern in civil and criminal cases, as well as in cases involving unrepresented and represented litigants, a few precepts are clear. Any claim that Plaintiff does not present to the district court is abandoned and cannot be raised later on appeal. See, *e.g.*, *Keck Garrett & Assocs., Inc. v. Nextel Commc'ns, Inc.*, 517 F.3d 476, 487 (7th Cir. 2008) (by failing to defend claim in its reply to movant's request for summary judgment, nonmovant abandoned its claim); *Gates v. Bd. of Educ. of the City of Chi.*, 916 F.3d 631, 641 (7th Cir. 2019) (affirming summary judgment of claims not presented to the district court, as "[t]he district court was not required to address a claim or theory that plaintiff did not assert.").

In this case, as noted in Part I(B) above, Plaintiff filed a brief [206] signed by experienced counsel. That brief is wholly inadequate in responding to the claims at issue, which alone could be viewed as a complete waiver. In fifteen pages, Plaintiff recites a slew of irrelevant facts alongside some relevant ones. More notably, the filing does not contain a citation to even a single case, and thus fails to stitch together any coherent presentation of the genuine disputes of material fact that would justify a trial on her professional negligence claim. See *Harney*, 526 F.3d at1104 ("[T]he opposing party may not simply rest upon the pleadings but must instead submit evidentiary materials that 'set forth specific facts showing that there is a genuine issue for trial'"). In fact,

Plaintiff does not directly address any of Defendants' arguments, enumerated below, that they are entitled to judgment as a matter of law.

To illustrate, even when Montgomery identifies an error she thinks advocate Simpson made, she does nothing to address Defendants' causation argument, described in further detail below—namely, that (1) she cannot show that but for the errors, the AJ would have overturned the charges against her, or (2) Simpson breached the standard of care (both of which are requisite to her professional negligence claim). For example, Montgomery explains that she once fired Erik Coates, who later resumed employment, only to be fired again later for theft, [206 at 3], and that her advocate, Simpson, "failed to call Erik Coates as a hostile witness" or "use any of the documents Jean Montgomery provided to show hostility." [*Id.* at 4]. But she does not explain the basis on which anything Coates might have said might have induced the AJ to rule in her favor on the dog-bite incident, especially in the face of the overwhelming evidence arrayed against her and the AJ's credibility findings. Nor does she explain whether or how a typical advocate in Simpson's position would have used Coates' testimony to advance any other element of her case. This is just one example of many where the tie between a fact cited by Montgomery in her "facts only" brief and any material issue or legal principle remains unspoken.

The abject failure to link any fact of consequence to any legal argument obviously undermines Montgomery's ability to show the existence of a triable issue of fact, especially when she is up against multiple strong arguments such as those marshalled by Defendants here. The burden, of course, remains with Defendants—and, as described in detail below, they have carried it on multiple fronts.

Montgomery's disregard for her burden—to raise a triable issue of fact on all elements of her professional negligence claim—could justify a ruling in Defendant's favor because it is a

16

complete waiver on major aspects of this case. But the Court will not throw out this case wholesale on that basis and will proceed to address whether Defendants have shouldered their burden of showing an entitlement to victory on the merits. That said, to hold Montgomery to *her* burden, the Court will weave in where waiver does apply on many salient points as to which she failed to present any legal argument to counter issues raised by Defendants [168].

### 2. Statute of Limitations

The Court begins with Defendants' contention that the statute of limitations expired on Montgomery's professional negligence claim. Defendants assert (1) that Montgomery's professional negligence claim is subject to the two-year statute of limitations that governs attorney malpractice, see 735 ILCS 5/13-214.3(b), and (2) the two-year period accrued at the latest on October 28, 2013. On this view of the facts and the law, Plaintiff's claim expired on October 28, 2015 (at the latest), more than a month before Montgomery filed her complaint in this case, on December 2, 2015. Plaintiff does not mention the statute of limitations issue, let alone address these arguments, in her opposition brief. See [206].[7]

---

[7] The only place Montgomery *has* quibbled with this affirmative defense is in her motion to strike [184] Defendants' Answer and Affirmative Defenses to Plaintiffs' Fifth Amended Complaint. The argument in her motion to strike is not well taken. An affirmative defense is designed to alert a party to the presence of an argument and to allow discovery on the matter. Both purposes have been served here: Defendants' pleading plainly placed Plaintiff on notice of Defendants' contention that she filed suit more than two years after the relevant MSPB decisions. See [176 (Defs.' Answer & Affirmative Defenses to Fifth Am. Compl.) at ¶ 24]. The Court also alerted Plaintiff to the possibility of the affirmative defense in ruling on Defendants' motion to dismiss the Fifth Amended Complaint. [135]. Although the Court ruled that it was premature to resolve the issue at that earlier stage of the case, see [*id.*], summary judgment is an appropriate time to take up this matter.

Plaintiff's argument in her motion to strike [184], filed *after* Defendants moved for summary judgment, is also not well taken. She does not claim what information, if any, was missing from the Answer that would have put her on notice and equipped her to mount a defense. See [184]. She did not file a reply to Defendants' response [196] to her motion. Nor has she ever argued that she is waiting for discoverable information that might alter that equation. See [186 (Pl.'s Mot. to Compel); 206 (Pl.'s Br.); 204 (Pl.'s Mot. for Leave to File Subpoenas)]; see also Fed. R. Civ. P. 56(d). Rather, she simply chose not to raise a counter-argument in her opposition to Defendants' motion for summary judgment at all.

Under 735 ILCS 5/13-214.3(b), Illinois has adopted a two-year statute of limitations for legal malpractice actions. This statute of limitations provision most straightforwardly applies to claims against attorneys. See *id.* at § 3(b)(i). However, subsection (b)(ii) of the statute expands the provision's reach to the "act[s] or omission[s]" of non-attorney employees as well. In relevant part, subsection b(ii) states that

> [a]n action for damages based on tort, contract, or otherwise * * * against a non-attorney employee arising out of an act or omission in the course of his or her employment by an attorney to assist the attorney in performing professional services must be commenced within 2 years from the time the person bringing the action knew or reasonably should have knowing of the injury for which damages are sought.

*Id.* "Generally, a plaintiff does not sustain an injury until he or she has suffered an adverse judgment, settlement, or dismissal in the underlying action." *Constr. Sys., Inc. v. FagelHaber*, LLC, 2019 IL App (1st) 172430, ¶ 20.

### a.     Accrual of the Cause of Action

In this case, Defendants argue that Plaintiffs' claim accrued—at the latest—on October 28, 2013. As previously indicated, in her opposition to summary judgment, Montgomery does not mention the statute of limitations, much less take issue with Defendants' view. She has thus waived any argument to the contrary. But even if Montgomery had not waived the argument, the Court agrees that the claim likely accrued on February 1, 2013, and certainly no later than October 28, 2013. The "adverse judgment," see *Constr. Sys., Inc.*, 2019 IL App (1st) 172430, ¶ 20, occurred on February 1, 2013, the date on which the AJ issued a ruling sustaining the charges against Montgomery. See [169 (Defs.' SOF) at ¶ 78; 169-4 (Exs. to Strom Decl.), Ex. C (Initial Decision) at 419]. On October 28, 2013, a three-judge panel of the MSPB affirmed the appeal. [169-4, Ex. D (Final Order) at 437]. Thus, even *if* the October 28, 2013 decision is the adverse judgment for statute-of-limitations purposes, the clock started running on Plaintiff's time to file

18

suit on that date and stopped as of October 28, 2015.  Plaintiff blew past the two-year mark when she waited to file the present lawsuit until December 2, 2015.

### b.      Applicability of 735 ILCS 5/13-214.3(b)

Having found that Plaintiff filed suit more than two years after her claim accrued, the next logical question is whether 735 ILCS 5/13-214.3(b) applies to Plaintiff's cause of action. Defendants argue that 735 ILCS 5/13-214.3(b) applies to Simpson because Montgomery's malpractice claim "ari[ses] out of an act or omission in the course of his * * * employment by an attorney *to assist* the attorney in performing professional services," and thus Simpson's conduct falls within the scope of subsection (b)(ii).  See 735 ILCS 5/13-214.3(b)(ii) (emphasis added).

One potential difficulty with Defendant's argument is that Simpson's acts or omissions may not have occurred in the course of "assisting" an attorney in performing professional services, 735 ILCS 5/13-214.3(b)(ii), but rather while he represented Plaintiff in the place of an attorney. Again, Plaintiff does not even mention a statute of limitations, much less address whether it applies to these facts.  And, again, her complete disregard for the issue abandons any counterargument on this uncertain issue.

But even if Montgomery had addressed the applicability of the statute, the Court agrees with Defendants that the statute likely applies on these facts.  The plain language of the statute clearly contemplates someone "assist[ing]" an attorney in the course of *the attorney's* matter—for example, a paralegal—but it does not necessarily encompass someone filling the shoes traditionally played by the attorney.  The parties have not pointed to, nor has this Court found, a case that extends the statute of limitations to apply to a non-attorney advocate who works with an attorney or in a legal practice in general, but who does not work *for* an attorney in the matter at issue.  But the absence of a case on all fours should come as no surprise given the fairly novel

context in which this case arises and the strict rules governing what types of professionals may appear before state and federal courts.

Nevertheless, even without a case on point, the structure of 735 ILCS 5/13-214.3(b) and the analogous statutory provisions and case law suggest the two-year statute of limitations in 735 ILCS 5/13-214.3(b) would apply with equal force to a professional negligence claim like Plaintiff's. Even if Simpson's potential liability did not arise from his assistance *to* a lawyer, the plain language is broad, perhaps to ensure that an attorney cannot find a loophole for an otherwise valid claim for professional malpractice simply because the paralegal made the error. See 735 ILCS 5/13-214.3(b). Furthermore, the Illinois courts import the same or similar standards from legal malpractice claims to other, analogous forms of professional negligence actions, such as claims against social workers and psychotherapists. See, *e.g.*, *Horak v. Biris*, 474 N.E.2d 13 (Ill. App. Ct. 1985) (social worker); *Corgan v. Muehling*, 574 N.E.2d 602 (Ill. 1991) (unlicensed psychologist). Parallel provisions of the Code of Civil Procedure dealing with accountant malpractice and negligence by other professionals, like physicians, also employ two-year statutes of limitations. See 735 ILCS 5/13-214.2(a) (accountants); 735 ILCS 5/13-212 (subjecting actions for personal injury by physicians or hospitals to two-year statute of limitations). Certainly, the loss associated with a claim such as this more closely resemble the damages in an attorney malpractice claim than losses caused by other types of malpractice that might be more difficult to detect, like a construction defect, and which therefore warrant a longer statute of limits. *Cf.* 735 ILCS 5/13-214 (applying four-year statute of limitations to construction engineering malpractice claims). The General Assembly cannot be faulted for not specifying a limitations period for the exact novel set of facts presented here, but the closest analogies on the books point strongly to two years for this kind of a case.

In short, Montgomery's failure to respond to Defendants' statute of limitations argument constitutes a waiver of the opportunity to contest the application of a two-year period in this case. But even if Montgomery had mounted a counterargument, every indication from the statute books and case law supports the application of the period set out in 735 ILCS 5/13-214.3(b). By filing her professional malpractice action on December 2, 2015, Montgomery missed the boat on bringing a timely claim, and her suit is barred by the two-year statute of limitations.

### 3. Proximate Cause

Montgomery also has not identified a triable issue of fact on the fourth element of her prima facie case, which presents another, alternative reason to grant judgment in Defendants' favor. In response to Defendants' arguments concerning the fourth prong of a professional negligence claim, proximate cause, Montgomery regurgitates a slew of mostly irrelevant facts but does not address the applicable case law on professional negligence nor does she explain how the facts map onto her theory of the case.

A cause of action based on professional negligence requires a Plaintiff to show all four of the following elements: "(1) the existence of a professional relationship, (2) a breach of duty arising from that relationship, (3) causation, and (4) damages." *SK Partners I, LP v. Metro Consultants, Inc.*, 944 N.E.2d 414, 416 (Ill. App. Ct. 2011). Because a professional malpractice claim is analogous to a legal malpractice claim, the Court looks to the standards employed by Illinois courts for that type of claim. As the Seventh Circuit framed the standard:

> A plaintiff asserting a legal malpractice claim based on Illinois law must prove: "(1) the defendant attorney owed the plaintiff client a duty of due care arising from an attorney-client relationship, (2) the attorney breached that duty, (3) the client suffered an injury in the form of actual damages, and (4) the actual damages resulted as a proximate cause of the breach."

*Bourke v. Conger*, 639 F.3d 344, 347 (7th Cir. 2011) (quoting *Fox v. Seiden* (*Fox I*), 887 N.E.2d 736, 742 (Ill. App. Ct. 2008)).

21

As for the fourth element, causation, the Illinois Appellate Court recently explained:

"To satisfy the proximate cause aspect of a malpractice action, the plaintiff must essentially plead and prove a 'case within a case,' meaning that the malpractice complaint is dependent on the underlying lawsuit." The plaintiff must plead sufficient facts to establish that, "but for" the negligence of the attorney, the client would have succeeded in the underlying suit. "Because legal malpractice claims must be predicated upon an unfavorable result in the underlying suit, no malpractice exists unless counsel's negligence has resulted in the loss of the underlying action."

*Brummel v. Grossman*, 2018 IL App (1st) 170516, ¶ 46 (citations omitted) (first quoting *Fabricare Equip. Credit Corp. v. Bell, Boyd & Lloyd*, 767 N.E.2d 470, 474 (Ill. App. Ct. 2002); and then quoting *Ignarski v. Norbut*, 648 N.E.2d 285, 388 (Ill. App. Ct. 1995)). To put it another way, a plaintiff must "present two cases, one showing that her attorney performed negligently, and a second or predicate 'case within a case' showing that she had a meritorious claim [or defense] that she lost due to her attorney's negligence." *West Bend Mut. Ins. Co. v. Schumacher*, 844 F.3d 670, 676 (7th Cir. 2016) (quoting *Mihailovich v. Laatsch*, 359 F.3d 892, 904–05 (7th Cir. 2004)).

*Elam v. O'Connor Nakos, Ltd.*, 2019 IL App (1st) 181123, is illustrative. In *Elam*, the parents of a woman who died leaving a concert sued the concert venue and accepted a small settlement. *Id.* ¶¶ 6–15. The parents then sued the lawyers who represented them in the underlying case against the venue for legal malpractice, claiming the lawyer-defendants deprived them of a larger victory by foregoing two theories of negligence against the venue. *Id.* ¶ 16. The trial court granted summary judgment in the lawyers' favor, and the Illinois Appellate Court affirmed. *Id.* ¶¶ 20, 54. The Appellate Court reasoned that the couple could not show a genuine dispute of fact to proceed on their malpractice case on the fourth prong, proximate cause, because they could not have prevailed on either theory of negligence in the underlying case against the concert venue. *Id.* ¶¶ 36–37, 52. In other words, without proving that the couple could have prevailed on the predicate "case-within-a-case" regarding the concert venue's alleged negligence, the attorney-defendants' performance did not cause the couple to accept an inadequate settlement. *See also*

22

*Bourke*, 639 F.3d at 347–48 (affirming summary judgment, although plaintiff discussed "various ways in which the [defendants] could have better represented [the plaintiff's] interests," those facts did not establish causation because they "fail[ed] to identify facts that support * * * that [the defendants'] alleged errors had any role in causing the jury to find [the plaintiff] guilty").

Here, the Court agrees with Defendants that Montgomery cannot point to a genuine dispute of material fact that Simpson's performance proximately caused her to lose her appeal before the AJ. Recall that USPS advanced two charges against Montgomery: the dog-bite-incident charge and the failure-to-perform-assigned-duties charge. To prove that she would have prevailed in the predicate appeal, Montgomery would need to demonstrate either that the preponderance of the evidence does not support the factual allegations giving rise to the agency's decision to remove an employee, see 5 C.F.R. § 1201.56(b), or that the agency's deciding official did not properly consider the factors for and against the penalty of removal. See *e.g.*, *Douglas v. Veterans' Admin.*, 5 M.S.P.R. 280, 306 (1981). As the Court will explain below, Plaintiff has no chance at proving her "case-within-a-case" to upend the AJ's liability or penalty findings on either charge. In Defendants' words, "Plaintiff's fate before the MSPB was sealed on the basis of her own undisputed conduct." [168 (Defs.' Br.) at 13].

### a. Dog-Bite Incident Charge

Regarding the dog bite incident, Montgomery was charged with failure to report an accident. A dog bit Montgomery's supervisee, a Letter Carrier named Ronald Ford, while Ford was delivering his mail route on October 22, 2011. Rather than reporting the incident or assisting Ford to obtain medical treatment as required, Montgomery directed Ford to resume delivering mail.

23

Montgomery cannot show that but for Simpson's performance, the AJ would have found the first charge unsupported by preponderant evidence. First and foremost, the underlying appeal took the form of a bench trial. It was undisputed at that proceeding that Montgomery never filed a report about the dog-bite incident, so the main issue at trial was whether Montgomery was aware, on the night of the incident, that Ford was injured. The AJ's ruling on the dog-bite incident, the most serious charge, came down to a credibility finding between the two main combatants: On the one hand, Montgomery, who claimed she did not learn about the bite the night of the incident, and on the other, Letter Carrier Ford, who claimed that he immediately informed Montgomery during his shift.

The AJ sided with Ford, ruling that Montgomery knew about Ford's injury because of the overwhelming evidence of Ford's version of events. The AJ's decision to credit Ford relied on Ford's live testimony that was corroborated by several others who testified during the proceedings or provided written statements. The key witnesses, including the injured employee and Montgomery herself, gave live testimony, and the AJ plainly credited the injured employee's testimony that he reported the incident to Montgomery. See [169-4 (Exs. to Strom Decl.), Ex. C (Initial Decision) at 420] (citing Ford's testimony that he "stated he returned to the station and reported the incident to [Montgomery] while showing her the hand wound."). There was also evidence in the record to infer that Ford's physical injuries alone put Montgomery on notice of the incident. Ford testified he was bleeding on his hand. See [*id.* at 420] (discussing his findings that his injuries included "puncture wounds on his hand, a 'big scrape' on his leg, and that the injuries caused visible blood stains on his clothes."). The Safety Managers testified that he could see the puncture wounds during an interview with Ford even after two weeks had elapsed from the incident. [*Id.* at 421]. And a third letter carrier provided a statement relaying that neighbors on

24

the route informed him that there was blood on the mail delivered the night of the incident. [*Id.* at 420]. The AJ explicitly stated that he relied on this evidence to "find contrary to the appellant's assertion, that she did become aware of Mr. Ford's injuries" and yet failed to report the incident. See [*id.* at 421] (rejecting Plaintiff's "contention she did not become aware" based on the fact the visible wounds and that Ford "took leave from work the day following").[8]

Nothing Montgomery points to in her brief [206] supports the proposition that she could prevail at trial on her case-within-a-case for this charge before the AJ. First, as with the statute of limitations issue, Montgomery has waived any argument to alter this conclusion. Montgomery has not furnished any fact from which a reasonable trier of fact could upend the AJ's finding on this score. Instead, she regurgitates a series of isolated facts to try to cast doubt on the AJ's findings. For example, she gestures broadly to documents about Erik Coates, one of the letter carriers who filed a written statement in the record corroborating the incident, and "documentation" about supervisor Prater, who also testified in support of the charge. Montgomery does not connect the dots to explain how those facts show her case was winnable had Simpson performed differently. In short, Montgomery has foregone any argument that Simpson proximately caused her to lose before the MSPB, and she therefore cannot satisfy the fourth element of her professional negligence claim.

Second, as best the Court can discern, even if Montgomery had developed an argument, nothing in the 700+ pages of documents that she has filed with this Court shows that but for Defendant Simpson's alleged errors, Montgomery would have won her appeal. For example, it

---

[8] Montgomery denies the allegation that Ford was absent from work in her statement of facts because it was a Sunday (i.e., not a delivery day), see [208 (Pl.'s Resp. to Defs.' SOF) at ¶ 12]. This dispute does not undermine the Court's finding. The AJ found an employee filled in for Ford the day following the incident, which suggests mail was delivered, even on a Sunday. [169-4 (Exs. to Strom Decl.) at 420]. Even without this written statement, Ford's own testimony, together with Lopez's and medical records were sufficient to discredit Montgomery's testimony.

appears from Montgomery's unspecified "documents" that she is trying to argue the AJ would have credited her testimony that she did not know about Ford's injury if Defendant Simpson had impeached Letter Carrier Coates and Supervisor Prater to show they were biased against her. Montgomery alleges that she was involved in firing Coates, who was then rehired before the incident, only to be fired later for alleged theft. Montgomery also claims that Prater obtained a promotion that Montgomery herself sought and was involved in a mediation concerning a fellow employee's discrimination allegations. [206 (Pl.'s Br.) at 4–5]. Montgomery also filed a whistleblower complaint against Prater. [*Id.* at 8].

Following a careful review of the AJ's ruling and a transcript of the proceedings, see [169-4 (Exs. to Strom Decl.), Ex. C (Initial Decision); 206-2 (AJ Hr'g Tr.)], the Court agrees with Defendants that the AJ's findings and ultimate ruling did not depend on the evidence that Montgomery now complains was inadequately addressed by Simpson. To be sure, the AJ noted Coates' testimony. But given that the AJ credited Ford's live testimony and the overwhelming and verified additional evidence supporting Ford and specifically rejected Montgomery's live testimony, Montgomery lacks any basis for convincing a jury that she "lost due to her attorney's negligence." The unexplored alleged biases of secondary or tertiary witnesses such as Coates and Prater are too speculative a basis to support a causation theory challenging the outcome of a bench trial that turned on credibility findings about the main players. Perhaps the situation might be different if Simpson had overlooked that the alleged victim—Ford—had a vendetta against Montgomery and fooled the AJ. But Montgomery does not suggest that Ford was out to get her, and in fact, Ford testified that he was on good terms with Montgomery. See [206-2 at 8, 12] (Ford's testimony that he "didn't want to get in trouble and [he] didn't want to cause no trouble for nobody" and "had no problem working with [Montgomery].").

In sum, Simpson's challenged strategy calls on the evidence and cross-examination "notwithstanding, [Montgomery] could not have succeeded on a claim alleging that" USPS's decision was not supported by preponderant evidence or that the penalty was the product of proper consideration of the factors. See *Elam*, 2019 IL App (1st) 181123, ¶¶ 36–37. As for the dog bite charge, Montgomery's fate was sealed because the predicate case "was unwinnable;" "the die was cast" by the overwhelming showing and the AJ's credibility determinations. See *Brummel*, 2018 IL App (1st) 170516, ¶ 38 (internal quotation marks omitted). The AJ heard from the main players in the dispute—Ford and Montgomery—and believed one and not the other. And on that basis, the AJ determined that Montgomery knew about but failed to report Ford's injuries. The key interactions took place "even before the time [Simpson] w[as] in play and had proceedings involving [the] matter." See *id*. And no document that Montgomery has identified, nor any cross-examination that was missing, could overcome the massive holes in her showing on the proximate cause element of her claim.

### b.  Failure to Perform Assigned Duties Charge

Given the gravity of the first charge and Montgomery's disciplinary record, there was enough to support the AJ's decision to sustain the penalty of removal, and this Court need not even address whether Montgomery could have prevailed on the second charge. But in any event, Montgomery cannot establish that Simpson's performance proximately caused her to lose her appeal on the failure-to-perform-assigned-duties charge, either.

Again, Montgomery cannot show that she would have prevailed on her "case-within-a-case" because she has mustered little-to-no facts and did not develop a shred of legal argument to show that had Simpson acted differently, the record would have lacked preponderant evidence to support the AJ's findings.

27

Even putting waiver aside, Montgomery might have won a few battles, but she still would have lost the war. The AJ's ruling on nearly half of the incidents that formed the basis for the second charge did not depend on the type of evidence of which she complains was missing. Recall that the AJ sustained fourteen "specifications," *i.e.*, independent incidents, to support the agency's charge that Montgomery had failed to perform her assigned duties. Plaintiff cannot convince a jury that she would have prevailed on this charge because nearly half of the incidents that comprise this charge relied on admissible documentary evidence, so any effort by Simpson to impugn Montgomery's supervisors could not have overridden the case against her.

To take just one example, the AJ found that Plaintiff failed to follow instructions to ensure that letter carriers completed their routes in the time allotted, *i.e.*, to complete their routes by 5 p.m. [169 (Defs.' SOF) at ¶ 52]. The AJ found the charge supported by "documentary evidence show[ing] that many carriers under the appellant's supervision * * * did not complete their assigned routes by 5:00 p.m. as instructed by Ms. Wilkins." [169-4 (Exs. to Strom Decl.) at 423]. That finding rested on multiple documents, admitted into the agency record, which showed that on multiple occasions the Englewood letter carriers were on delivery routes past 5:00 p.m. [*Id.*] (AJ decision citing USPS reports). See also [*id.*, Ex. I at 631–41] (reports). Plaintiff has not developed any argument that those reports were inadmissible or hearsay. But even had she made the case that Simpson failed to draw out those issues or her supervisors' biases, the incident would have been sustained. The ALJ's ruling rested on cold, hard facts showing that she failed to comply with the rules.

The AJ also relied on indisputably untainted evidence to support two other incidents involving Montgomery's inappropriate conduct on the job, including her inappropriate and insulting comments to Supervisor Wilkins. [169-4 (Exs. to Strom Decl.), Ex. C (Initial Decision)

at 425]. In finding the specifications supported by preponderant evidence, the AJ relied on clear documentation that Montgomery made the insulting remarks. Specifically, in response to Wilkins's questions about Montgomery's responsibilities, she wrote in an email, submitted on the agency record, that she "did not sleep around for my position, that is not to say that you [Wilkins] did, but if the shoe fits, wear it" and further told Wilkins to "put [her] ego in her purse and your anger where it [is] needed." [*Id.*]. The AJ further relied on Montgomery's *own* testimony admitting—or not denying—that she made the insulting comments to Wilkins. [*Id.*]. See also [206-2 (AJ Hr'g. Tr.) at 62–63] (Montgomery's testimony).

Granted, in ruling on certain other incidents, the AJ did rely on some of the evidence that Plaintiff now complains about—such as the testimony of supervisors whom Simpson did not impeach—to find "preponderant evidence." However, none of those incidents raise a triable claim on the "case-within-a-case" before the MSPB for three reasons. First, as noted above, Plaintiff has waived any argument by failing to make even a superficial legal argument on this score. Second, the Court may disregard those incidents because they represent only a *fraction* of the whole picture given the fourteen incidents that constituted the second charge. As noted, even if Plaintiff could have made some headway in undermining one or even a few of the charges against her, nearly half of the incidents—far more than a handful—would have stuck no matter how much of the extra evidence she wanted to introduce had been presented to the AJ.

Third and finally, it is not clear that this Court needs to reach the failure-to-perform charge to find that Simpson's alleged errors did not proximately cause Plaintiff to lose her appeal. The AJ reasoned that the preponderant evidence supported charge one, the dog-bite incident. Specifically, the AJ stated that Plaintiff's "failure to perform an elementary requirement of her job, to file a report and protect subordinate employees from harm" showed that "appropriate

disciplinary cause exists to promote the efficiency of the service." [169-4, Ex. C (Initial Decision) at 430]. He added that removal was an appropriate penalty after weighing the balance of factors, including a past disciplinary record which "concerned some of the same types of deficient performance" and also "placed on notice of her need to correct her behavior" which reflected poorly on her "rehabilitative potential." [*Id.*]. See also *Douglas*, 5 M.S.P.R. at 304–05 (describing relevant factors in reaching penalty decisions, including nature of incident and rehabilitative potential). These conclusions are no less true if Montgomery's performance had been found wanting once rather than twice.

### 4.    Expert Testimony Requirement

The last point worth addressing here is Defendants' argument that Montgomery's claim falls short because it is missing an essential element—namely, expert testimony. As explained below, the Court agrees with Defendants that expert testimony would be required at trial, and absent the presentation of such testimony Montgomery could not prevail. But the Court does not rule in Defendants' favor on this issue, because it is not clear from the record that any schedule for expert discovery had been set. To be sure, as Defendants note, this Court expressly told Montgomery [see 135, at 11] that "the standard of care in a professional negligence case must be established through expert testimony." The Court sees nowhere in the record where Montgomery identified or disclosed any potential expert. And given the myriad legal issues that went ignored in Montgomery's deficient briefs, it is hardly surprising that she makes no mention of the standard of care or how the evidence adduced to date supported the existence of a triable issue on that element of her claim. But the Court cannot entirely discount the possibility that Montgomery may have thought she had additional time for expert discovery after the close of fact discovery, so the

discussion below is made for completeness, and does not constitute yet another alternative basis for ruling on the current dispositive motion.

Defendants submit that absent the presentation of expert testimony, she cannot establish two of the four elements of a *prima facie* case: (1) the requisite standard of care Simpson owed to her or (2) that Simpson breached any duty based on that standard of care. In professional negligence claims in Illinois, "the established standard of care * * * is stated as the use of the same degree of knowledge, skill and ability as an ordinarily careful professional would exercise under similar circumstances." *Hassebrock v. Bernhoft*, 815 F.3d 334, 341 (7th Cir. 2016) (quoting *Advincula v. United Blood Servs.*, 678 N.E.2d 1009, 1020–21 (Ill. 1996)). "[I]n professional negligence cases, * * * the plaintiff bears a burden to establish the standard of care through expert witness testimony." *Id*. (quoting *Advincula*, 678 N.E.2d at 1021). As the Illinois Supreme Court explained, the expert testimony requirement is designed to compensate for the fact that jurors "are not equipped to determine what constitutes reasonable care in professional conduct without measuring the actor's conduct against that of other professionals." *Advincula*, 678 N.E.2d at 1021.

Courts have recognized only two exceptions to the plaintiff's burden to introduce expert testimony in support of a professional negligence claim. When the "'common knowledge or experience of lay persons is extensive enough to recognize or infer negligence from the facts, or * * * [the professional's] negligence is so grossly apparent that a lay person would have no difficulty appraising it,' a plaintiff can proceed to trial without expert testimony." *Hassebrock*, 815 F.3d at 341 (quoting *Hatchett v. W2X, Inc.*, 993 N.E.2d 944, 963 (Ill. App. Ct. 2013)). Illinois courts "have found the common knowledge exception to apply in cases where, for example, the attorney fails to comply with the statute of limitations or where the attorney fails to take any action whatsoever." *Fox v. Seiden* (*Fox II*), 2016 IL App (1st) 141984, ¶ 23 (citations omitted) (common

knowledge exception did not apply to case in which "the question of legal malpractice [was] fraught with thorny legal and factual issues" such as "the American Rule, fee-shifting statutes, the law of conspiracy, waiver, forfeiture, and other legal and factual considerations that are beyond the ken of laypersons"). [9]

In this case, the Court agrees with Defendants that Montgomery's professional claim could not proceed to trial without an expert to support her claim. See *Hassebrock*, 815 F.3d at 341. A lay juror (much less this Court) has no tools with which to determine what types of evidence advocates before the MSPB, a different tribunal with different rules and customs, typically introduce when representing an employee facing disciplinary charges. Without an expert, there is no way for a fact finder to appraise whether the bar that Montgomery has set for Simpson's performance is at the appropriate height, much less whether Simpson cleared that bar. Nor would any exception to the expert testimony requirement rescue Montgomery's claim. Understanding rules like hearsay and authentication, much less the habits and customs of representatives before the MSPB, go well "beyond the ken" of a lay person. See *Fox II*, 2016 IL App (1st) 141984, ¶ 24. In short, whether Simpson's performance was up to par in proceedings before the MSPB and its AJs is not a matter of common knowledge.

### B. Remaining Motions

All that remains are the parties' motions to strike certain allegations in the Fifth Amended Complaint and Answer, as well as their motions before Magistrate Judge Finnegan to compel

---

[9] Absent a showing that a plaintiff's claim falls into one of the limited exceptions to the expert testimony requirement, "the simple fact [is] that without expert testimony, jurors, not skilled in the profession, are not equipped to judge the professional's conduct." *Studt v. Sherman Health Sys.*, 951 N.E.2d 1131, 1136 (Ill. 2011). For that reason, the Illinois Supreme Court has struck down a pattern jury instruction used by an Illinois court in a professional negligence action because that instruction "expand[ed] the nonexpert evidentiary sources applicable to a professional negligence action," see *id*, 951 N.E.2d at 1138, thereby collapsing "[t]he distinction between the evidence required to establish professional negligence versus institutional negligence, recognized and preserved by this court in cases like *Advincula*," see *id.* at 1136.

discovery and subpoena certain witnesses. Specifically, Defendants moved to strike certain allegations in Montgomery's operative complaint [171], and Montgomery moved to strike Defendants' answer [184]. Montgomery also moved to compel Defendants' Answers to Discovery Requests and Enforcement of Third-Party Subpoenas [186], and later sought leave to issue Subpoenas for Deposition of seven witnesses [204].

All motions are denied as moot because none of the motions bear on the dispositive matters addressed above. In its motion to strike allegations in the Complaint [171], Defendants contend that Montgomery purported to rely on various exhibits in her Fifth Amended Complaint that were not filed with the Court or were otherwise defective. Defendants thus sought to strike a defective exhibit as well as citations within the Fifth Amended Complaint to non-existent exhibits. [171 at ¶¶ 21, 24]. They also sought to strike Montgomery's request for punitive or liquidated damages. [*Id.* at ¶¶ 25–27]. None of these alleged defects affect the outcome of this case—that Defendants are entitled to judgment in their favor on the professional negligence claim—and thus Defendants' motion [171] is moot.

Montgomery also moved [184] to strike Defendants' Answer to the Fifth Amended Complaint for failure to comply with Federal Rules of Civil Procedure 8 and 11. [184 (Pl.s' Am. Mot. to Strike Defs.' Answer to Fifth Am. Compl. & All of Defs.' Affirmative Defenses) at 5]. According to Montgomery, the most egregious issues are the denial of allegations in Paragraphs 66 and 67, as well as answers to Paragraphs 126 through 142. She also seeks to strike all of Defendants' affirmative defenses. Relevant here, Montgomery claims the "statute of limitations defense lacks any factual support." [184 at 15].

Like Defendants' motion, Montgomery's additional motions amount to irrelevant side skirmishes. Although some of the allegations (and corresponding answers) with which

Montgomery takes issue relate to witnesses and evidence that she complains should have been brought before the MSPB, those allegations are likewise moot. No discovery flowing from those allegations could have cured the main defects in this case addressed above. To the extent that the discovery sought even remotely related to the proximate cause issue, the Court agrees with Defendants that the motion to strike is unpersuasive. For example, Defendants' Answer to the allegations, see [176 (Defs.' Answer & Affirmative Defenses to Fifth Am. Compl) at ¶¶ 66–67], depended on "Plaintiff's allegation" that she provided statements "to Defendants in support of their, and specifically Simpson's, preparation to represent her before the MSPB," exhibits which were supposedly attached to the Fifth Amended Complaint. See [196 (Defs.' Resp. to Pl.'s Mot. to Strike) at 7]. Magistrate Judge Finnegan asked about the provenance of those exhibits, see [210 (Tr. of Apr. 22, 2021 Hr'g) at 16–18], and Montgomery has since filed an affidavit disavowing any suggestion that she provided Exhibits R through Z to Defendant Simpson (nor could she have provided them to Simpson, as the documents appear to be dated after the MSPB hearing). [194 (Aff. of Jean A. Montgomery Answering Court's Questions) at ¶¶ 4–5]. The Court will not strike Defendants' responses in its Answer. As noted above, see Part III(A)(2) above, Montgomery's objection to the statute of limitations defense fares no better.

The Court finally turns to the discovery motions [186], [204] currently before Magistrate Judge Finnegan. Plaintiff moved for an order compelling Defendants to answer discovery requests and to enforce third-party subpoenas served in the case. [186]. Magistrate Judge Finnegan ruled in part on that motion to enforce the third-party subpoenas. See [190]; [210 (Tr. of Apr. 22, 2021 Hr'g) at 4]. As for the remaining requests, Judge Finnegan ordered the parties to supplement their motions. Plaintiff also moved for leave to file third-party subpoenas [204] for depositions of Louis Atkins (former VP of NAPS), Nancy L. Wesley (former Illinois Area VP of NAPS), Loretta

Wilkins (Plaintiffs' former supervisor), Wanda Prater (Plaintiffs' former supervisor), Donald R. Nichols (USPS Manager), Brian Wagner (Current President of NAPS), and Charles May (former president of NAPS Illinois). See [204]; [210 at 12] (recounting positions of each of the recipients of the subpoenas). All of these discovery motions are moot, as none of the requests for production nor witnesses can cure the fundamental defects that sink Montgomery's case. The targets of the subpoenas are various NAPS officials and Montgomery's colleagues at USPS. Thus, any potentially discoverable information would go to Simpson's failure to call certain witnesses or introduce certain evidence. But, for the reasons explained above, it does not appear that any of the discovery sought could alter this Court's proximate cause conclusion.

## IV. Conclusion

After litigating this case for seven years and receiving considerable leeway by this Court in matters ranging from defective pleadings, to motion practice, to extensions of time, the Court concludes that Montgomery has not overcome Defendants' convincing arguments that there is no genuine issue of triable fact on the single remaining claim for professional negligence. Accordingly, the Court grants Defendants' motion for summary judgment [167] and denies as moot the remaining motions in the case [171], [184], [186], and [204]. A final judgment consistent with Federal Rule of Civil Procedure 58 will issue against Plaintiff and in favor of Defendants. Civil case terminated.

Dated: March 31, 2022

Robert M. Dow, Jr.
United States District Judge